Mr. Justice Brennan
delivered the opinion of the Court.
The Interstate Commerce Act provides that it is unlawful for any person engaged in a business other than transportation to “transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person.” §203 (c), 49 U. S. C. § 303 (c).[1] Appellees deal in livestock and commodities from a place of business in San Antonio, Texas. They make deliveries in their own trucks to customers in Louisiana, and buy sugar at Supreme, Louisiana, which they backhaul 525 miles for resale to customers in San Antonio. The Interstate Commerce Commission held that this backhaul was not exempt under § 203 (c) as “transportation . . . within the scope, and in furtherance, of a pri *445 mary business enterprise . . of appellees, but was “conducted with the purpose of profiting from the transportation performed, and, as such, constitutes for-hire carriage for which operating authority from this Commission is required.” 81 M. C. C. 33/, 347.[2] A three-judge court in the District Court for the Western District of Texas set aside the ICC order. 219 F. Supp. 781.[3] We noted probable jurisdiction. 375 U. S. 901. We affirm.
Section 203 (c) was designed explicitly to authorize the ICC to eliminate transportation which, though carried on in the guise of private carriage, was in effect for-hire carriage, and thus might lawfully be carried on only by an authorized common or contract carrier. Before the enactment of § 203 (c) the ICC was able to reach such abuses by interpreting § 203 (a) (17), 49 U. S. C. § 303 (a) (17), so as to exclude such “pseudo-private” carriage from its definition of a “private carrier of property by motor vehicle” as a person, not a “common” or “contract” carrier, who transports property of which he “is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise.” Many of the cases involved nonauthorized carriers in the transportation business who resorted to transparent “buy-and-sell” devices to evade ICC regulation. A typical buy-and-sell arrangement is one under which the carrier “buys” property at a shipping point, transports it to a delivery point and there “sells” it to the real purchaser, the “profit” to the carrier amounting to the price of the transportation between the *446 two points.[4] Similar evasions through the use of spurious buy-and-sell agreements were found in cases where property was transported in trucks regularly used by noncarrier businesses to make pickups and deliveries.[5] The ICC was faced with the necessity of determining on the facts of each case whether the transportation constituted private carriage beyond the scope of ICC economic regulation, or for-hire transportation subject to all relevant provisions of the Act. In other words, here, as in United States v. Drum, 368 U. S. 370, 374, in which we dealt with another aspect of the “pseudo-private” carriage problem, the ICC has also “had to decide whether a particular arrangement gives rise to that ‘for-hire’ carriage which is subject to economic regulation in the public interest, or whether it is, in fact, private carriage as to which Congress determined that the [noncarrier’s] interest . . . should prevail.”
In the course of discriminating between this pseudo-private carriage and that transportation which was in fact in furtherance of a noncarrier business, the ICC developed the so-called “primary business” test. This test was first enunciated by the full Commission in Lenoir Chair Co., 51 M. C. C. 65, ail’d, sub nom. Brooks Transportation Co. v. United States, 93 F. Supp. 517, aff’d, 340 U. S. 925. A chair manufacturer delivered some of its products in its own trucks. Whenever possible, it also used the vehicles to backhaul manufacturing materials for use and processing in its own plant. The ICC concluded, 51 M. C. C., at 76, that the delivery of goods and the backhaul were lawful private carriage because undertaken “as a bona fide incident to and in furtherance of *447 [its] primary business . . . The governing standard was stated as follows, id., at 75:
“If the facts establish that the primary business of an operator is the supplying of transportation for compensation then the carrier’s status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale. ... If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona fide furtherance of the primary business or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both.”
The ICC believed, however, that § 203 (a) (17) was not sufficiently explicit, particularly since decisions of some lower courts after Brooks raised doubts whether a truck operator could be found to be an unauthorized “for-hire” carrier in the absence of some affirmative showing that his operations brought him within the definitions of common or contract carriage.[6] Consequently the Commission sought additional legislation.[7] The original ICC bill in this area would have amended the definition of “private carrier” in § 203 (a) (17) to prohibit the buy-and-sell device employed by pseudo-private carriers as a subterfuge to avoid regulation. See S. 1677, H. R. 5825, 85th Cong., 1st Sess. This was withdrawn, however, in favor of a *448 more broadly phrased provision, sponsored by the Transportation Association of America, which encompassed not only buy-and-sell devices, but also similar subterfuges which might be employed to engage in unauthorized for-hire transportation.[8] The second clause of § 203 (c) is substantially the TAA proposal.
The 1958 amendment appears on its face to codify the primary business test as the standard for determining whether a particular carrier is engaged in a private or for-hire operation. The appellants argue, however, that the amendment was intended to impose a broader limitation in the case of backhaul operations of the kind engaged in by appellees. The United States urges in its brief that Congress in 1958 was particularly concerned with the diversion of traffic from regulated carriers by backhauling operations, and that one object of the 1958 amendment was “to make plain that the purchase and sale of goods solely to take advantage of available backhaul capacity cannot qualify as a 'primary business enterprise (other than transportation).’ ” We understand this argument to be that Congress in effect enacted a per se test outlawing trucking operations limited to backhaul capacity without inquiry into whether that operation was undertaken pursuant to a bona fide noncarrier business enterprise. We find no support in either the words of the amendment or its legislative history for putting that gloss upon the amendment. On the contrary, we are persuaded that *449 Congress meant only to codify the primary business test which, as applied by the ICC, requires an analysis of the backhaul operation in the factual setting of .each case.
The legislative history fully supports this view. The ICC Chairman, speaking in support of the TAA amendment, expressly stated that, in his view, its effect would be to “incorporate the primary business test into the statute.”[9] Similarly, the President of TAA, speaking directly to the backhaul problem, said that “Our proposal . . . would affect . . . the carrier who delivers his own goods in one direction, as a legal private carrier, but then resorts to the buy-and-sell practice to get a return load.”[10] The Senate and House Reports, while less crystal clear, nevertheless reveal no purpose beyond codification of the Brooks test. Thus the Senate Report states that the amendment “accurately reflects the holding in the Brooks case.” [11] Although the House Report includes a discussion of the backhaul problem in language which tracks the statement in the ICC 1953 Annual Report — where the Commission first directed the attention' of Congress to the problem of buy-and-sell arrangements [12] — the House Report concludes: “There is no in *450 tention on the part of this Committee in any way to jeopardize or interfere with bona fide private carriage, as recognized in the Brooks case.” [13] Moreover, the managers of the bills in both Senate and House gave assurances that the object of the amendment was to incorporate the primary business test into positive law.[14] No application of the primary business test by the ICC or the courts gave conclusive effect to backhauling. The critical determination made in each case was between spurious buy-and-sell arrangements, whether or not as part of a backhaul, and a true wholesaling operation utilizing the operator’s own trucks. Backhauls were treated as merely one aspect of the buy-and-sell problem, since the presence of backhaul capacity presents a special temptation to indulge in pseudo-private carriage.
We therefore conclude that § 203 (c) merely codifies the primary business test, and embodies no outright prohibition of backhauling practices. The statutory scheme recognizes that mere availability and use of backhaul capacity may in particular cases be completely consistent with the bona fide conduct of a noncarrier business. Thus the question in this case is a narrow one: whether, applying the standards developed under the primary business test, appellees’ backhauling of sugar was within the scope, and in furtherance, of a primary, noncarrier business.
In developing and applying the primary business standard, the ICC has elaborated criteria characteristic of the spurious buy-and-sell device. Among these are *451 the large investment of assets or payroll in transportation operations;[15] negotiating the sale of goods transported in advance of dispatching a truck to pick them up; [16] direct delivery of the transported goods from the truck to the ultimate buyer, rather than from warehoused stocks;[17] solicitation of the order by the supplier rather than the truck owner;[18] and inclusion in the sales price of an amount to cover transportation costs.[19]
We are not persuaded from our examination of the record that there is sufficient evidence to support the ICC’s conclusion that the appellees’ sugar operation was for-hire transportation and not transportation within the scope, and in furtherance, of appellees’ noncarrier business enterprise. The ICC found that appellees “have long been buying and selling certain commodities and in connection therewith transporting them to purchasers, in bona fide furtherance of their primary business, as a dealer in those commodities.” 81 M. C. C., at 345. The ICC found further that “The more usual arrangement under which [appellees] operate . . . appears to be one in which the [appellees] have no preexisting sugar order, but buy with the intention of selling later either en route or after the transportation is accomplished. This procedure is ordinarily coordinated with a backhaul, and the *452 purpose of their sugar dealings is the generation of sugar shipments which they can transport as return lading for their trucks which are moving in the opposite direction.” 81 M. C. C., at 346. But these findings, on this record, are consistent with an operation “within the scope, and in furtherance, of a primary business enterprise.” Appel-lees began their business in 1934 as dealers in livestock. They gradually added a feed mill and the buying and selling of corn, oats, wheat, bran, molasses, salt and fertilizer. They added sugar in 1954. Moreover, in addition to the absence of the element — usually found in spurious buy-and-sell arrangements — of obtaining orders for a commodity (in this case sugar) before purchasing it, other indicia are absent. Appellees’ assets are not in large part composed of transportation facilities, nor is transportation a major item of expense; appellees bear the full risk of damage in transit and, since they sell at market price, also of loss in value due to price changes; they buy the sugar on credit with a discount for payment in 10 days, and sell on the same terms; their sugar accounts receivable at the date of hearing exceeded $10,000, and amounted to $20,000 or $30,000 during the previous year. It is true that they warehoused only a small stock of sugar and that generally the trucks delivered the sugar directly to buyers upon, or within a day or two after, arrival in San Antonio. Appellees offered an entirely reasonable explanation for this, however: sugar is a perishable commodity, the preservation of which apparently requires air conditioning facilities with which their warehouse is not equipped; the ICC offered nothing to the contrary. And the ICC offered no evidence that other sugar dealers in San Antonio conducted their businesses differently from appellees. It is also true that since the motor carrier rate for transporting sugar from Supreme is 69 cents, and the rail rate $1.09 per hundred pounds, appellees could not have conducted the sugar *453 business but for the availability of the backhaul capacity of their trucks. This shows no more than that appellees were able to make efficient use of their equipment; on these facts it does not prove, as the ICC found, that the “transportation ... is, with respect to their primary business of buying and selling livestock and certain other commodities, a related or secondary enterprise conducted with the purpose of profiting from the transportation performed . . . 81 M. C. C., at 347. We agree with the District Court that, rather, “The record clearly indicates that [appellees] are in a general mercantile business buying and selling many items, including sugar.” 219 F. Supp., at 782. As such, on the facts shown, their purchase of sugar at Supreme to provide a backhaul in connection with outbound movements of livestock and other commodities from San Antonio is within the scope, and in furtherance, of their primary general mercantile business enterprise.

Affirmed.

 Section 203 (c), as added in 1957, 71 Stat. 411, provided in pertinent part:
. .no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce . . . unless there is in force with.respect to such person a certificate or a permit issued by the Commission authorizing such transportation.”
In 1958, 72 Stat. 574, the section was amended to add the provision here involved providing,
“nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person.”

 The 1957 version of § 203 (c) was enacted after the examiner submitted his report but as amended in 1958 was part of the Interstate Commerce Act when Division 1 of the Commission served its report.

 Appellees’ action was brought pursuant to 28 U. S. C. §§ 1336, 1398. The statutory three-judge court was convened under 28 U. S. C. § 2325.

 See, e. g., Lyle H. Carpenter, 2 M. C. C. 85; B. E. Farnsworth, 4 M. C. C. 164; Thomas Stanley Redding, 7 M. C. C. 608; ICC v. Tank Car Oil Corp., 151 F. 2d 834 (C. A. 5th Cir.).

 See, e. g., T. J. McBroom, 1 M. C. C. 425; Triangle Motor Co., 2 M. C. C. 485. Cf. Congoleum-Naim, Inc., 2 M. C. C. 237.

 See, e. g., ICC v. Woodall Food Prods. Co., 207 F. 2d 517 (C. A. 5th Cir.); Taylor v. ICC, 209 F. 2d 353 (C. A. 9th Cir.). See the discussion of Taylor in the Commission’s Sixty-eighth Annual Report (1954), p. 82.

 The Commission pressed for amendments in its Annual Reports from 1953 through 1957: 1953 Report, p. 55; 1954 Report, p. 5; 1955 Report, p. 99; 1956 Report, p. 2; 1957 Report, pp. 137-138.

 In amending §203 (c) rather than the definitional sections, the TAA proposal also met the protests of private carriers who opposed ICC’s proposal on the ground that it might be construed to throw doubt on the Brooks test, and unduly restrict the scope of private carriage. See Remarks of Frazor T. Edmondson, Private Truck Council of America, Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 1384, 85th Cong., 1st Sess., 163 (1957); Remarks of R. J. Van Liew, Private Carrier Conference, American Trucking Associations, id., at 275.

 See Remarks of Chairman Clarke, Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 1384, 85th Cong., 1st Sess., 13, 19 (1957).

 See Statement of Mr. Baker, President, Transportation Association of America, id., at 244, 246.

S. Rep. No. 1647, 85th Cong., 2d Sess., 5 (1958).

 In its 1953 Annual Report the Commission said (p. 55):
“Merchandising by motortruck, whether actual or pretended, over long distances is increasing to such an extent that it is becoming a major factor in the transportation of freight between distant points. Manufacturers and mercantile establishments, which deliver in their own trucks articles which they manufacture or sell, are increasingly purchasing merchandise at or near their point of delivery and transporting such articles to their own terminal for sale to others. Such transportation is performed for the purpose of receiving compensation for the otherwise empty return of their trucks. Sometimes the *450 purchase and sale is a bona fide merchandising venture. In other cases, arrangements are made with the consignee of such merchandise for the 'buy-and-sell' arrangement in order that the consignee may receive transportation at a reduced cost.” Compare H. R. Rep. No. 1922, 85th Cong., 2d Sess., 18 (1958).

 See id., at 19.

See 104 Cong. Rec. 12535-12536 (1958) (House); 104 Cong. Rec. 10818 (1958) (Senate).

 See Virgil P. Stutzman, 81 M. C. C. 223, 226; Joseph V. Hofer, 84 M. C. C. 527, 540.

 See Lyle H. Carpenter, 2 M. C. C. 85, 86; Thomas Stanley Redding, 7 M. C. C. 608, 609; Jay Cee Transport Co., 68 M. C. C. 758, 759; Church Point Wholesale Beverage Co., 82 M. C. C. 457, 459, aff'd, sub nom. Church Point Wholesale Beverage Co. v. United States, 200 F. Supp. 508 (D. C. W. D. La.).

 See L. A. Woitishek, 42 M. C. C. 193; Jay Cee Transport Co., supra; William Stewart, 89 M. C. C. 281, 286.

 See Subler Transfer, Inc., 79 M. C. C. 561, 565; Riggs Dairy Express, Inc., 78 M. C. C. 574, 575-576; Donald L. Wilson, 82 M. C. C. 651, 661.

 See Riggs Dairy Express, Inc., supra.