GENSLER and others, Appellants, v. DEPARTMENT OF REVENUE, Respondent.

*No. 509 (1974). Argued October 29, 1975.—*
*Decided December 19, 1975.*
(Also reported in 236 N. W. 2d 648.)

1110

For the appellants there was a brief by *Hamilton & Mueller* of Dodgeville, and oral argument by *Roger Mueller.*

For the respondent the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J. The principal issue in this case is whether the taxpayers used their motor trucks exclusively as contract carriers. This is controlling in this case, because the Wisconsin Department of Revenue has asserted that the taxpayers operated a trucking business as private carriers and cannot claim the contract carriers exemption from a use tax.

Under subch. III of ch. 77, Stats., private carriers are obliged to pay a sales or use tax on accessories, attachments, and parts, but contract carriers are specifically exempted from such requirement by sec. 77.54 (5) (b).[1]

We conclude that the circuit court, which affirmed the tax appeals commission, committed an error of law in determining that the taxpayers did not operate motor vehicles used exclusively as contract carriers. We reverse.

---

[1] "77.54 **General exemptions.** There are exempted from the taxes imposed by this subchapter:

"(5) The gross receipts from the sale of and the storage, use or other consumption of:

"(b) Motor trucks, truck tractors, road tractors, busses, trailers and semitrailers, and accessories, attachments, parts, supplies and materials therefor, sold to common or contract carriers who use such motor trucks, truck tractors, road tractors, busses, trailers and semitrailers exclusively as common or contract carriers, including the urban mass transportation of passengers as defined in s. 71.18 (2) (a)."

The taxpayers are Arden T. Gensler, Evelyn C. Gensler, and Forrest W. Gensler. All three of these individuals originally operated a trucking, cattle buying, selling, and feeding operation, doing business as Gensler Brothers. This partnership dissolved on March 31, 1967. From that date until December 31, 1967, Arden T. Gensler operated a trucking and hauling business as a sole proprietor; and on January 1, 1968, Gensler, Inc., was formed, of which, apparently, Arden T. Gensler is the sole owner. The exact relationship of any of these parties is not of importance in the disposition of this appeal, since the same factual matters are relevant in respect to all the taxpayers, and disposition of the question of whether the operation was a contract-carrier operation or a private-carrier operation is dispositive of all the taxpayers' interests in that respect.

The trucking operations involved three distinct phases —the hauling of lead and zinc ore from the base of the Eagle-Picher mine at Shullsburg to a crusher at the surface; the hauling of lead and zinc concentrate from the Eagle-Picher mine at Shullsburg to a railroad loading dock at Scales Mound, Illinois; and the selling and delivery of mine tailings and sand in Illinois and in Wisconsin.

It was stipulated that the trucks used in hauling ore to the crusher at the mine were used exclusively in contract carriage. It was also agreed by the state on oral argument that the portion of the operation by which the taxpayers hauled lead and zinc concentrate from the mine to the railroad at Scales Mound, Illinois, was a contract-carrier operation. The only disputed portion of the operation, and that which the Department of Revenue claims constituted private carriage, was the hauling of mine tailings and sand from Shullsburg to the railroad and to municipalities and other area residents. The tax appeals commission found that this operation was not

contract hauling but was the private carriage of sand and gravel owned by the taxpayers and that the cost of haulage was only incidental to the "sale" of tailings and sand. The trial judge concluded that the findings of the commission were supported by substantial evidence and, therefore, affirmed the order of the commission in its entirety.

In addition to this major issue, the tax appeals commission also considered the contention of the taxpayers that, under the provisions of sec. 71.07 (5), Stats., they were entitled to apportion their income for tax purposes on the basis of the ratio of the haulage in Wisconsin and Illinois, respectively. The tax appeals commission refused to allow the apportionment, and the circuit judge affirmed that determination.

The statute upon which the taxpayers principally rely is sec. 77.54 (5) (b), Stats. The tax statutes do not define contract carriers. They are, however, defined in ch. 194, the Motor Vehicle Transportation Act. These definitions of ch. 194 are relied upon by the Department of Revenue, the taxpayers, and the trial judge. It is appropriate to do so. Accordingly, then, the principal question on this appeal is whether the trucks employed by the taxpayers in their hauling operations (sand and gravel) were used exclusively as contract carriers, under the definitions of ch. 194.

The evidentiary facts in this case are undisputed. The assets of the taxpayers are exclusively dump trucks, pick-ups, a winch truck, a power shovel, and a grader. All of the assets are used in conjunction with the hauling operation. The taxpayers secure their sand and gravel from piles of tailings accumulated by the operation of the Eagle-Picher mine at Shullsburg.

By an agreement entered into between Eagle-Picher and the taxpayers, a price per ton of all the tailings has been established. It is undisputed that, upon delivery to

an ultimate consumer by the taxpayers, the consumer is billed on the basis of the cost of the tailings to the taxpayer plus a charge for hauling, which varies in proportion to the length of the haul. The billing to the consumer is made in a lump sum, but the taxpayers testified, and it is unrebutted, that the consumer price is the sum of those two figures.

At periodic intervals—usually a month—the taxpayers account to Eagle-Picher for the amount of gravel and tailings removed. Although the contract authorizes the taxpayers to remove the tailings that have been stacked at the mine site, Eagle-Picher refused to sell the entire stock of tailings to the taxpayers. When prices have been increased by the mining company, this increase has been passed on by Gensler to the consumer in the identical amount. The taxpayers themselves do not have a stockpile of tailings or gravel anywhere.

The evidence is uncontradicted that they have never advertised gravel for "sale." They have only advertised "gravel hauling." The taxpayers testified that they make no profit from any sale of gravel but make a profit only from hauling the gravel.

At the time the consumer is billed for the delivery, the consumer is also charged the sales tax on the value of the gravel. Because the type of material hauled is of an exceedingly low value for a given volume, the mining company concluded that it was uneconomical for them to enter into any billing arrangements with the consumer.

During the course of the reorganization of the taxpayers set forth above, partnership assets were distributed, including the motor vehicles, accessories, attachments, parts, and supplies. The taxpayers declined to pay a sales and use tax upon such transfers and upon purchases, claiming the exemption under sec. 77.54 (5) (b), Stats. It is the tax on these items of personal

property with which this proceeding and appeal are concerned.

On the basis of the facts set forth above, which we deem to be undisputed, the commission found:

"Trucks, truck parts, tires and repairs purchased during the periods in question for use in hauling of lead and zinc concentrate from the Eagle-Picher mine to Scales Mound, Illinois, and for use in selling and delivering mine tailings and sand were not purchased for use exclusively in common or contract carriage. They were used partly in private carriage."

In holding that the taxpayers' vehicles were not used exclusively as contract carriers, both the tax appeals commission and the circuit court relied on the assumption that a seller-buyer relationship existed between the taxpayers and the consumers and that Eagle-Picher had no voice in determining the "price" charged by the taxpayers to the ultimate consumer.

As stated above, the definitions appropriate to the resolution of this case are those in ch. 194, Stats. The statutory definitions are:

"194.01 **Definitions.** In this chapter, unless the context otherwise requires:

" . . .

"(11) 'Contract motor carrier' means any person engaged in the transportation by motor vehicle of property for hire and not included in the term 'common motor carrier of property.'

"(14) 'Private motor carrier' means any person except a common or contract motor carrier engaged in the transportation of property by motor vehicle other than an automobile or trailer used therewith, upon the public highways.

"(15) 'For hire' means for compensation, and includes compensation obtained by a motor carrier indirectly, by subtraction from the purchase price or addition to the selling price of property transported, where the purchase or sale thereof is not a bona fide purchase or sale. Any person who pretends to purchase property to be trans-

ported by him; or who purchases such property immediately prior to and sells the same immediately after the transportation thereof shall be presumed to be transporting such property for hire and not a bona fide purchaser or seller thereof, which presumption may be rebutted. . . ."

Sec. 194.01 (11), Stats., defines a contract motor carrier as one engaged in the transportation by motor vehicle of property "for hire" who is not a common carrier. "For hire" is defined in sec. 194.01 (15) as meaning "for compensation" and "includes compensation obtained by a motor carrier indirectly, by subtraction from the purchase price or addition to the selling price of property transported, where the purchase or sale thereof is not a bona fide purchase or sale."

Additionally, sec. 194.01 (15), Stats., excludes as a bona fide sale a situation where one "purchases such property immediately prior to and sells the same immediately after the transportation thereof."

It is thus apparent that, under these definitions, a naked sale of a commodity by one who hauls it is not in itself the controlling criterion for the determination of whether the hauler is a contract carrier; and in this case, it is abundantly clear that, although the taxpayers had a contractual right to take the tailings from the mine property, they incurred no obligation to the mine until the tailings were actually appropriated by them for the purpose of delivery to the ultimate consumer. This was only done when an order was to be delivered forthwith to the consumer. The cargo was not stockpiled by the taxpayers at either end of the haul.

Thus, under the Wisconsin statutes, for the purposes of determining whether the taxpayers constitute a contract carrier, it is to be presumed that no sale has occurred. True, this is only a presumption and may be rebutted. That portion of the statute does not indicate

precisely how the rebuttable presumption shall be overcome, but it is clear that the burden is upon the state, not the taxpayer. Furthermore, the same subsection states:

"Nothing herein contained shall be construed to include motor vehicle operations which are conducted merely as an incident to or in furtherance of any business or industrial activity."

It seems clear that this latter language has reference to the substantive nature of the taxpayers' business. Under the facts of this case, the question, then, is: Are the taxpayers involved in a hauling operation and by the hauling make their profit, or are they involved in a sales operation and the cost of hauling is merely incidental to the primary business of selling.

There appear to be no comprehensive criteria established by the Department of Revenue, the tax appeals commission, the public service commission, or this court for the determination of the "primary business test." However, such a test and the criteria therefor have been fully developed under the Federal Interstate Commerce Act. 49 USCA, sec. 303 (a), ff.[2] The purpose of the

[2] Sec. 303 (a) (15) provides in pertinent part:
"(15) The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of . . . property . . . for compensation . . . ."
Sec. 303 (a) (17) provides in pertinent part:
"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier . . .' or 'contract carrier . . .', who or which transports . . . by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."
Sec. 303 (c) provides in pertinent part:
". . . no person shall engage in any for-hire transportation business by motor vehicle . . . unless there is in force with

ICC regulations are, of course, primarily to pierce the spurious veil of private carriage, when in fact the hauler should be required to be licensed by the ICC as a "for-hire" carrier. Thus, while the federal standards, in effect, inspect the mirror image of the problem faced by this court, the criteria developed in the federal system are relevant and, we believe, controlling in the determination of whether the carrier in the instant case is involved in private carriage, as the Department of Revenue contends, or whether the taxpayers are correct in their assertion that they are engaged in contract carriage.

The United States Supreme Court in *Red Ball Motor Freight v. Shannon* (1964), 377 U. S. 311, 84 Sup. Ct. 1260, 12 L. Ed. 2d 341, discussed these relevant provisions of the Interstate Commerce Act. The court noted that a typical buy-and-sell arrangement, that, on its face, appeared to be private carriage but was in fact contract carriage, arises when the carrier "buys" property at the shipping point, transports it to a delivery point, and there "sells" it to the real purchaser, and the profit to the carrier amounts only to the price of the transportation between the two points.

The test set up by the Interstate Commerce Act, the supreme court held, was the "primary business test," which codified *Lenoir Chair Co.* (1949), 51 M. C. C. 65, affirmed, *sub nom. Brooks Transportation Co. v. United States*, 93 Fed. Supp. 517, affirmed, 340 U. S. 925, 71 Sup. Ct. 501, 95 L. Ed. 668. The court in *Red Ball* applied the following standard to determine whether any particular haulage was contract carriage or. private carriage. The supreme court said:

respect to such person a certificate or permit issued by the Commission authorizing such transportation . . . unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person."

" 'If the facts establish that the primary business of an operator is the supplying of transportation for compensation then the [contract] carrier's status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale. . . . If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona fide furtherance of the primary business or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both.' " (P. 315)

The supreme court then noted some of the criteria to be employed in applying the standard:

"Among these are the large investment of assets or payroll in transportation operations; negotiating the sale of goods transported in advance of dispatching a truck to pick them up; direct delivery of the transported goods from the truck to the ultimate buyer, rather than from warehoused stocks; solicitation of the order by the supplier rather than the truck owner; and inclusion in the sales price of an amount to cover transportation costs." (Pp. 318, 319)

While it is true that this "primary business test" was first employed to pierce subterfuge private carriage, it nevertheless furnishes objective standards controlling to the principal issue in this case; and that test is applicable even though no attempt at subterfuge has taken place. *See: Church Point Wholesale Beverage Co. v. United States* (1961), 200 Fed. Supp. 508, 514, and *Wilson—Investigation of Operations* (1960), 82 M. C. C. 651, 655. Moreover, the state, in its brief, appears to concede that it is the "primary business test" with which we are concerned, for it asserts that the "Appellants have a primary business enterprise involving the sale and delivery of tailings, gravel and sand to various customers."

While it is true that a naked sale occurs in the transactions undertaken by the taxpayers, the question is: Are the motor operations in furtherance of the business of selling or are sales merely a secondary enterprise where the actual purpose and the effect of the operation is to profit from the transportation performed. A finding that a company is engaged in performing transportation for compensation for the purpose of profiting from that transportation, as distinguished from a purpose merely to recover the cost of transportation, is inconsistent with, and precludes, the finding that the motor operations are conducted in the furtherance of its commercial enterprises. Under such a finding, it is required that the hauler be found to be a contract motor carrier. *See: Lenoir Chair, supra,* page 75, and *Woitishek Common Carrier Application* (1943), 42 M. C. C. 193. *Red Ball* makes clear that this issue, however, must be determined on the basis of the particular facts of a particular operation. Numerous detailed criteria have been developed by the federal courts to apply this general standard. These criteria include:

1. Whether the carrier is the owner of the property transported.

2. Whether orders for the property are received prior to its purchase by the carrier.

3. Whether the carrier utilizes warehousing facilities and the extent of this use as a storage place.

4. Whether the carrier undertakes any financial risks in the transportation-connected enterprise.

5. Whether the carrier includes in the sale price an amount to cover transportation costs and its relation to the distance the goods are transported.

6. Whether the carrier transports or holds out to transport for anyone other than itself.

7. Whether the carrier advertises itself as being in a noncarrier business.

8. Whether its investment in transportation facilities and equipment is the principal part of its total business investment.

9. Whether the carrier performs any real service other than transportation from which it can profit.

10. Whether the respondent at any time engages for-hire carriers to effect delivery of the products, as might be expected, for example, when it is called upon to fill an order and its own equipment is otherwise engaged.

11. Whether the products are delivered directly from the shipper to the consignee (*i.e.*, without intermediate warehousing).

12. Whether solicitation of the order is by the supplier rather than the truck owner.

*See: Utley Lumber Co., Inc.—Investigation of Operations* (1964), 94 M. C. C. 458; *Wilson—Investigation of Operations* (1960), 82 M. C. C. 651; *Wilko Corp.—Investigation of Operations and Practices* (1966), 103 M. C. C. 201; *T & T Supply, Inc.—Investigation of Operations* (1967), 103 M. C. C. 946; *Garland, et al.—Investigation of Operations and Practices* (1966), 102 M. C. C. 437.

Under these criteria, there seems little doubt that the taxpayers are engaged in the business of hauling for hire, rather than the business of selling gravel. We consider each of these criteria in turn:

1. Ownership of the property transported. The taxpayers take title to the gravel upon loading at the mine. This, however, is of little consequence, for title is taken only upon loading and is relinquished immediately upon completion of the carriage. Moreover, the ultimate consumer, by a pre-existing order, has already obligated himself to take title upon delivery.

2. Pre-existing order by the customer. As stated above, orders are received prior to any appropriation by

taxpayers of the gravel. It is held in *Garland, et al.—Investigation of Operations and Practices* (1966), 102 M. C. C. 437, that such an arrangement is inconsistent with the status of a dealer or seller of the property transported.

3. The taxpayers maintain no storage facilities whatsoever.

4. The taxpayers assume no risk of loss, nor are they in any jeopardy in respect to price changes, since it is understood that all changes in price established by Eagle-Picher will be passed on to the consumers. The taxpayers are, in all events, assured of receiving their fixed transportation costs, irrespective of fluctuations in price.

5. The price differential between the cost to the taxpayers and the charge to the consumer is the transportation charge, and while the consumer is charged only a lump sum, that figure, undisputably, is arrived at by adding the cost of transportation to the original cost of the commodity. That mark-up for transportation varies in proportion to the distance the commodity is hauled. The mark-up is significant only as a transportation charge. *Garland, supra,* page 446; *T & T Supply, Inc.— Investigation of Operations* (1967), 103 M. C. C. 946.

6. The taxpayers hold themselves out on a contractual basis for hauling zinc-bearing ore and zinc concentrate for Eagle-Picher and the railroad, and hold themselves out as a contract hauler.

7. The taxpayers advertise only hauling and not the sale of gravel.

8. The taxpayers' investment is wholly in transportation facilities and equipment. They own no stockpiles, no gravel pits, and no rock-crushing or screening equipment. Their employees are either truck drivers or mechanics or other persons directly concerned with actual truck-loading operations.

9. No service other than transportation is performed by the taxpayers, and they provide no accessorial services

from which they secure any profit. The testimony of the taxpayers is unrebutted that they derive no profit except from the transportation of the commodities.

10. The taxpayers, insofar as the record reveals, have never employed any "for-hire" carriers.

11. The taxpayers deliver directly to the buyer. No loading is performed until there is an order for delivery; and, upon loading, the product is delivered directly to the consumer with no intermediate warehousing.

12. There is no solicitation by the supplier, Eagle-Picher, of the ultimate consumer. However, the record shows that at one time the supplier was involved in such transactions but was unwilling to continue to do so because of the extremely low unit cost of the tailings, which meant that Eagle-Picher could not profitably perform the billing operations. The taxpayers collect the price of the gravel for Eagle-Picher, and also, in practice, the taxpayers purchase the commodities for the consumer only because Eagle-Picher could not afford to become involved in direct sales to the consumer.

A review of the criteria in relation to the facts of this case shows that the transportation of the tailings and sand was not merely incidental to the sales. The enterprise was concerned only with the haulage of the sand, and it was from that haulage that the profit was made. The taxpayers were engaged in furnishing transportation for compensation and were not engaged in any merchandising enterprise. They are, accordingly, contract carriers and, as such, can properly claim the exemption afforded by sec. 77.54 (5) (b), Stats.

Inasmuch as neither the commission nor the circuit court gave any recognition to the "primary business test," which is an appropriate test under sec. 194.01 (15), Stats., but instead relied only on the facial aspect of the transaction that there was a title transfer of the gravel from the taxpayers to the ultimate consumer, to conclude

that this was a merchandising effort, an error of law was committed. While looked at alone, the acquisition of title by the carrier and its subsequent transfer to a consumer may be relevant. That relevancy must be weighed in light of the other criteria and cannot be solely determinative of the taxpayers' status.

Because no weight was given to the other controlling criteria, the determination was erroneous as a matter of law. Inasmuch as the facts upon which we rely are undisputed, only a matter of law is presented to this court. Accordingly, we are not required to determine whether there is substantial evidence to support the findings of the commission.

Because only a question of law is presented by this record, it would be improper for this court to remand to the tax appeals commission for further consideration. Moreover, the decision was made in this instance by the tax appeals commission, which has no special expertise in the determination of status as a contract carrier.

While this court does not have the expertise that the public service commission has in this respect, and we are mindful that some testimony was taken from employees of the public service commission, the decision was not made by that commission. The question, as this court views it, is a matter of law.

Nor is there any expertise to be applied in reference to the question of taxability once the status of the taxpayers is determined. It follows as a matter of law that the taxpayers are exempt if, as we conclude, they are contract carriers.

The question remains whether any of the income tax of the partnership or the tax of Arden Gensler for the year 1967 should have been apportioned. The tax appeals commission concluded that the income could not be apportioned, and the circuit judge affirmed that conclusion. The finding of the tax appeals commission on its face is insufficient, since it amounts only to a conclusion of

law that: "The income of the petitioners was of a type none of which was apportionable to another state and, in any event, the petitioners did not establish a record on the basis of which an amount of apportioned out of state income could be determined."

It is obvious that a conclusion of law cannot be reviewed as a finding of fact; and to the extent that the finding refers to a deficiency of record, it cannot be reviewed, because the deficiency is not pointed out. The trial judge's finding of fact and his opinion are more informative. He held that, as a matter of law, the income derived from the Illinois portion of the operations was not apportionable, because the computations were made not only on the basis of the delivery of zinc concentrate to the railroad at Scales Mound, which was clearly and concededly a contract operation, but also on the "sale" of tailings, which, under the commission's view and the view of the trial court, constituted private carriage. That rationale is correct. We have determined, as a matter of law, however, that the delivery of tailings in Illinois and elsewhere was contract hauling. Accordingly, it was error to deny the apportionment on the basis that the income sought to be apportioned was not from an activity recognized by the statutes and 8 Wis. Adm. Code, sec. TAX 2.47.

It appears from the record, however, that the basis on which income was apportioned was not confined to gross receipts from hauling. The amounts collected from the sale of tailings and sand were included in the gross receipts in addition to the amounts collected from the hauling of the tailings and sand. This is not what the regulation calls for. The regulation requires that the apportionment be made on the basis of hauling income allocable to the respective states. As the income from the sales of tailings and sand was included in taxpayers' apportionment computations, the apportionment did not strictly comply with the regulation.

We conclude that, were the formula correctly applied, the income derived from Illinois was apportionable. However, because both the commission and the circuit court erred as a matter of law in determining whether the taxpayer was engaged exclusively in contract carriage, the conclusion was incorrectly reached. We therefore reverse the judgment in respect to the apportionment of income, with directions that the tax appeals commission conduct such further proceedings as may be necessary to determine whether an allocation can properly be made. Accordingly, in respect to that portion of the judgment which held that the taxpayers were not engaged exclusively in contract carriage, the judgment is reversed. In respect only to that portion of the judgment which denied any apportionment of income, the judgment is reversed and the proceedings remanded for further consideration.

*By the Court.*—Judgment reversed and proceedings, in part, remanded for further consideration.