ALMON, Justice.
The Alabama Public Service Commission (“PSC”), Alabama Gas Corporation (“Alabama Gas”), and two intervenors, Lena Mae Calhoun and Winnie L. Thomas, appeal from a judgment reversing the PSC’s holding that Gas Utilities of Alabama, Inc. (“GUA”), is subject to regulation by the PSC. The PSC had held that GUA was a “transportation company” under the definition of that term in § 37-2-1, Ala.Code 1975, and, therefore, subject to regulation by the PSC. The issue is whether, pursuant to § 37-2-1 and other applicable statutes, a company such as GUA, which proposes to supply one or more customers with natural gas through a pipeline, is subject to regulation as a “person ... that ... may ... own, operate, lease, manage or control, as common carriers or for hire ... *749 any pipeline for the transportation of oil or other commodity.”[1]
The dispute originated when GUA began soliciting customers of Alabama Gas. GUA’s intention was to supply natural gas to certain industrial customers at a rate lower than the rate charged by Alabama Gas. GUA’s proposal entailed building pipelines to the customers from existing commercial pipelines, thereby bypassing Alabama Gas. GUA ultimately procured a contract to supply Lawter, Inc., with natural gas. This contract provided that GUA would build a pipeline from the Magnolia Pipeline to Lawter’s facility. The contract stated that GUA would buy the gas, transport it through its pipeline, and resell it to Lawter. GUA would make its profit and cover its expenses from the transportation charge provided for in the contract.
Following the formation of this contract, Lawter informed Alabama Gas that it would no longer be purchasing gas from Alabama Gas. Alabama Gas filed a complaint with the PSC, seeking a determination that GUA was a “transportation company” operating a pipeline “for hire,” within the meaning of § 37-2-1, and therefore was subject to regulation by the PSC. Calhoun and Thomas intervened as low-income residential customers of Alabama Gas, and on behalf of other such customers, asserting that they “would be adversely affected by any activities which would either increase residential rates or ... cause residential rates not to decrease.” After a hearing, the PSC determined that GUA was a transportation company. GUA appealed to the Circuit Court of Montgomery County. The circuit court held that the PSC could not regulate GUA’s activities because, it held, GUA was not a public utility and the PSC therefore had no jurisdiction over it. The PSC, Alabama Gas, and the two intervenors appeal.
In a case that was very similar factually, this Court held that a pipeline company was not a “public utility,” as that term is defined in § 37-4-1, because it did not hold itself out as furnishing gas “to or for the public,” as required by § 37-4-1(7). Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm’n, 524 So.2d 357 (Ala.1988). The circuit court in this ease relied on Coastal States in rendering its judgment. To distinguish the holding in Coastal States, the PSC and Alabama Gas insist that this case does not present the question whether GUA is a public utility, but only whether it is a transportation company operating a pipeline for hire. Thus, argue the appellants, the circuit court erred in holding that GUA is not subject to regulation simply because it is not a public utility. • In short, the question is whether GUA is subject to regulation under Chapter 2 of Title 37 even though it is not subject to regulation as a public utility under Chapter 4.
This case is not without difficulty, because its resolution will affect significant issues of public policy regarding regulation of public utilities and private entities.[2] The appel *750 lants’ brief filed on behalf of Thomas and Calhoun presents an argument and cites a case that we have found very helpful on the question. The argument is that, although GUA is not a public utility, it is nevertheless subject to regulation because its proposed operations could seriously impair the economic viability of Alabama Gas and other similar public utilities[3] by “cherry picking” the large-volume industrial customers. The argument asserts that the loss of these large industrial customers would probably require Alabama Gas to raise its rates, because, for example, although the total volume of its sales of gas might be reduced significantly, its overhead and other fixed expenses would not be commensurately reduced and it would have to allocate these expenses among its remaining customers. Alabama Gas also makes such an argument.
A similar argument was rejected in Coastal States:
“The Commission has reached a contrary result in this case, we respectfully conclude, by arrogating to itself an authority under § 37-4-1(7) that it does not possess. The rationale of its finding that Coastal States is a public utility is, simply put, that a contrary finding would allow Coastal States, and others situated like it, to take business away from public utilities regulated by the Commission, making its regulation a ‘sham.’ Thus, it concluded that its duty was to ‘balance the interests of the companies involved’ and to gauge ‘the effect of the company’s activities upon the public at large.’ The Commission’s order added:
“ ‘It is clear in this ease that the sales contemplated by Coastal States will have a much broader effect on the market than just that which it will have upon Coastal States and the two customers with which it presently has a contract. It will affect the price which each and every consumer of natural gas in the Mobile Gas [Service Corporation] service area will pay for the gas which he or she uses.’
“Whether such a result would be in the offing, nevertheless, the test of a public utility as set out in the Commission’s order does not comport with the test that this Court has utilized heretofore [i.e., that a business is a ‘public utility’ only if it holds itself out as ready to serve all members of the public], which is supported by the authorities we have cited, and which has remained unchanged at least since 1937. Any modification thereof, we conclude, is properly a matter for legislative action.”
524 So.2d at 364-65 (footnotes omitted).
However, Thomas and Calhoun, by citing Osborne Truck Lines, Inc. v. Alabama Pub. Serv. Comm’n, 284 Ala. 166, 223 So .2d 284 (1969), show how the argument prevails under § 37-2-1 in a way that it could not prevail under § 37-4-1. The difference derives from the phrase in § 37-2-1 specifying that transportation companies are those that perform the listed activities “as common carriers or for hire.” As we shall show below, a common carrier is analogous to a public utility in holding its services out for use by the public, whereas a business that holds its services out for hire is not necessarily a public utility, but may be subject to regulation because it operates in the same field as common carriers or public utilities.
This distinction was observed in Osborne Truck Lines in the context of Chapter 3 of Title 37 of the Code, which regulates motor-vehicle carriers. Section 37-3-2(6) defines “common carrier by motor vehicle,” and § 37-3-2(7) defines “contract carrier by motor vehicle.” Although the definition of “contract carrier” does not use the phrase “for hire,” this Court in State v. L.P. Gas Transport Co., 260 Ala. 637, 638, 71 So.2d 839, 840 (1954), held that “One must be engaged in transporting property of another for hire to be a contract earner as defined [in the precursor of § 37-3-2(7) ].” Thus, Chapters 2 and 3 are parallel in regulating common carriers and are essentially parallel in regulating transportation companies for hire and contract carriers, which operate for hire. Therefore, the reasoning in Osborne Truck Lines is pertinent to our analysis of § 37-2-1.
*751 The dispute in Osborne Truck Lines concerned an application by a contract carrier for a permit as required by the precursor of § 37-3-13. Seven common carriers holding certificates of public convenience and necessity under the precursor of § 37-3-10 protested the issuance of the permit, but the PSC granted it over the protests. The circuit court, on appeal, affirmed the grant of the permit. The precursor of § 37 — 3—13(b) provided that a permit “shall be issued” if the applicant met certain qualifications and if “it appears from the application and the evidence ... that the operation, to the extent authorized by the permit, will be consistent with the public interest, [but that] otherwise the application shall be denied.”
This Court reversed, holding that the evidence of the protesting common carriers established that the applicant’s operation would not be “consistent with the public interest,” because the protesting common carriers had
“presented ample and convincing evidence that they had adequate and sufficient equipment, including needed specialized facilities, to perform with efficiency and due dispatch the carrier services which the applicant Carroll proposed to render.”
284 Ala. at 169, 223 So.2d at 287. The common carriers “contended that they wanted and needed the business of these shippers.” Id. The Court explained its holding in the following paragraphs:
“We do not think it would be consistent with public interest for the Commission, with judicial sanction of this Court on review, to authorize contract carriers to lure off lucrative customers, for whom common carriers have been rendering reasonable and efficient service, and gradually erode or impede the common carrier’s ability to perform adequate and quality service to other customers. There should be a stopping point that lends competitive and financial protection to common carriers in their efforts to serve the public in a manner that comports with the implied mandates of their certificates of convenience and necessity.
[[Image here]]
‘We might further comment that any erosion or impairment of the financial ability of the common carriers to perform by taking away from them lucrative business and giving it to a contract carrier, particularly to enable the customer to meet competition, or possibly to gain some advantage, is not consistent with public interest. Such public interest as related to the business world is dependent on an adequate and efficient motorized common carrier system which should not be potentially weakened or impaired by the issuance of contract carrier permits that have a tendency to decrease the volume and remuneration of such carriers that is needed to sustain efficient common carrier service.”
284 Ala. at 169-70, 223 So.2d at 288. Accord, Redwing Carriers, Inc. v. Alabama Pub. Serv. Comm’n, 356 So.2d 129 (Ala.1978); H.T.L., Inc. v. Alabama Pub. Serv. Comm’n, 359 So.2d 380 (Ala.1978); Ross Neely Express, Inc. v. Hornady Truck Lines, Inc., 387 So.2d 782, 786-87 (Ala.1980).
Alabama Gas, as a public utility, is in the same position here as were the common carriers in Osborne Truck Lines. As those carriers were, Alabama Gas is obligated by its certificate of convenience and necessity to provide service to the general public at reasonable rates. GUA’s proposed operation, and unregulated proliferation of similar operations, the appellants assert, could “decrease the volume and remuneration ... that is needed to sustain efficient [public utility] service.” Such “transportation companies for hire,” if businesses such as GUA indeed come within that term, are required by § 37-2-4 to obtain certificates of convenience and necessity:
“No transportation company shall undertake the extension of its service or the construction of a new plant, property or facility, except ordinary extensions in the usual course of business, or shall acquire or operate any line, plant or property of another transportation company, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require, or will require, or the public interests will be best served by, such extension, construction, ac *752 quirement, operation or acquirement and operation.”
By the definition of “transportation company,” this requirement applies both to companies that are common carriers and to those that transport for hire. Thus, Chapter 2 requires transporters for hire to obtain a certificate of convenience and necessity, whereas Chapter 3 requires contract carriers only to obtain a permit. The fact that the Code imposes a higher regulatory burden on transportation companies for hire than on motor-vehicle contract carriers strengthens our conclusion that the “public interest” rationale of the Osborne Truck Lines line of eases applies to transportation companies as well as to motor vehicle carriers.
With these points in mind, we proceed to consider GUA’s arguments that its contract does not bring it into the ambit of Chapter 2 of Title 37 as a transportation company operating for hire.
First, GUA argues that it is not a transportation company because, it says, it will not provide service to the public. It cites § 37-2-3, which provides, in part:
“The Public Service Commission is charged with the duty of supervising, regulating and controlling all transportation companies doing business in this state, in all matters relating to the performance of their public duties and their charges therefor, ... and shall require them to establish and maintain all such public service facilities and conveniences as may be reasonable and just....”
(Emphasis as added by GUA.) GUA argues that this statute defeats the appellants’ attempt to distinguish Coastal States, because, it argues, under § 37-2-3 a business is a transportation company only if it has public duties, just as under § 37-4-l(7)b., a business selling gas is a public utility only if it sells it “to or for the public.”
This argument is answered by the distinction, developed above, between common carrier transportation companies and transportation companies for hire. A common carrier will have more public duties and presumably will thus be subject to more extensive regulation by the PSC. However, a transportation company for hire will be subject at least to the requirement, imposed by § 37-2-4, that it obtain a certificate of public convenience and necessity. Thus, even if it is true that GUA has and will have no public duties, that fact would not prevent it from being a transportation company for hire.
GUA also argues that it is not a transportation company, because, it says, under the custom and usage of the gas industry, its contract is a sales agreement, not a transportation agreement. The only testimony before the hearing officer was given by Dan Tutcher, vice president of GUA. On “cross-examination” by GUA’s counsel, he gave testimony about the differences in his industry between a transportation contract and a sales contract, and he stated that the contract between GUA and Lawter was a sales contract.
However, this evidence and GUA’s argument present, at best, a fact question or a question within the expertise of the PSC that the PSC decided adversely to GUA. On such questions, a reviewing circuit court exercises limited review of an order by the PSC, taking it “as prima facie just and reasonable” and setting it aside only if the court finds that “(1) The commission erred to the prejudice of appellant’s substantial rights in its application of the law; or (2) The order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence.” § 37-1-124, Ala.Code 1975. On a question of fact, a reviewing court ordinarily inquires “no further than to ascertain whether there is evidence to support the findings of the APSC.” General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm’n, 424 So.2d 1288, 1289 (Ala.1982). Accord, Ross Neely Express, Inc. v. Hornady Truck Lines, Inc., 387 So.2d 782, 784-85 (Ala.1980).
The PSC’s order, rejecting GUA’s argument that it is a seller, not a transporter, of gas, was supported by substantial evidence. GUA’s tax returns listed its “business activity” as “natural gas distribution” and its “product or service” as “transportation.” Indeed, the contract reflects that GUA would make its profit solely by charging for the transportation of the gas. The PSC looked *753 to the substance, not the form or the self-serving characterization, of the transaction and found that GUA is operating as a transportation company; it wrote: “To accept GUA’s argument would allow parties to avoid regulation by the Commission by employing transparent buy and sell devices to take title during transportation in an attempt to make the transaction look like a sale.” The PSC’s findings and conclusions are supported by the evidence on this point.
Next, GUA argues that even if it can be deemed to be a transportation company, it does not operate for hire. It argues that it is buying the gas at the beginning point of its pipeline and that title to the gas does not pass until it passes through the meter at the Lawter plant. It cites State v. L.P. Gas Transport Co., 260 Ala. 637, 639, 71 So.2d 839, 840 (1954), as holding that a person or entity “engaged in transporting its own property and not that of another” is not a contract carrier operating for hire. The PSC rejected this argument, citing Red Ball Motor Freight, Inc. v. Shannon, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964), as holding that “for-hire transportation is involved even where the transporter buys the commodity where it picks it up and sells it upon delivery, if the primary purpose and function is transportation.” “In this case,” continues the PSC’s order, “the primary purpose of the arrangement between Lawter and GUA and of the pipeline owned by GUA is to transport natural gas for a fee.” Again, the PSC’s order is sustainable in this regard.
For the foregoing reasons, the circuit court erred in reversing the PSC’s order. The circuit court’s judgment is reversed, and a judgment is hereby rendered sustaining the order of the Alabama Public Service Commission, which held that GUA is a transportation company for hire. As explained above, GUA’s status as a transportation company for hire requires at the least that GUA obtain a certificate of public convenience and necessity pursuant to Ala.Code 1975, § 37-2-4, and it may subject GUA to further regulation by the PSC.
REVERSED AND JUDGMENT RENDERED.
HOOPER, C.J., and SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
MADDOX and HOUSTON, JJ., concur in the result.

. The first sentence of § 37-2-1 reads:
"The term ‘transportation company’ shall mean and include every person not engaged solely in interstate commerce or business that now or may hereafter own, operate, lease, manage or control, as common carriers or for hire: Any railroad or part of a railroad in this state or any cars or other equipment used thereon, or bridges, terminals or sidetracks used in connection therewith, whether owned by such railroad or otherwise; any express companies; any car companies; any sleeping car companies; any steamboat or steam packet company or common carrier for hire by water regardless of the propelling power used; any railroad depot or terminal station; any telegraph line; any telephone line; any pipeline for the transportation of oil or other commodity, whether the transportation is by pipeline or partly by pipeline and partly by rail, truck or water.”
(Emphasis added.) The remainder of the section ' is not pertinent to this appeal.

. Part of the difficulty comes from the fact that pipeline companies were added as transportation companies by a 1945 amendment that gave no explanation as to how they were to be regulated. Compare T. 48, § 102, Ala.Code 1940, with Ala. Acts 1945, No. 510, p. 732. Most of the provisions in Article 1 of Chapter 2, Title 37, are specifically directed toward railroads, and other provisions are best adapted to railroads. However, the 1945 amendment deliberately added pipeline companies to the definition of "transportation companies” (it did nothing else), so it is our duty to ascertain and apply, as best we can, the legislative intent in providing for regulation of pipeline companies as transportation companies.

. Such as amicus curiae Mobile Gas Service Corporation.