# IN THE SUPREME COURT OF IOWA

No. 14–1553

Filed March 11, 2016

**UNITED SUPPLIERS, INC.** d/b/a **GREENBELT TRANSPORT,**

Appellant,

vs.

**RENNY HANSON, R. HANSON TRUCKING, INC.,** and **KENNETH DIRISIO,**

Appellee.

---

**RENNY HANSON, R. HANSON TRUCKING, INC.,** and **KENNETH DIRISIO,**

Cross-Appellants,

vs.

**NATIONWIDE AGRIBUSINESS INSURANCE COMPANY,**

Cross-Appellee.

---

Appeal from the Iowa District Court for Hardin County, Michael J. Moon and James A. McGlynn, Judges.

The plaintiff agricultural supply company appeals the district court's grant of summary judgment to the defendants in an action for indemnification. **REVERSED AND REMANDED.**

Matthew J. Haindfield, Seth R. Delutri, and Jason Palmer of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant United Suppliers and cross-appellee Nationwide.

Rene Charles Lapierre of Klass Law Firm, LLP, Sioux City, for appellee and cross-appellant Hanson and R. Hanson Trucking.

Troy A. Howell of Lane & Waterman LLP, Davenport, for appellee and cross-appellant DiRisio.

**MANSFIELD, Justice.**

### I.  Introduction.

This dispute over who will pay the bill for an overturned and wrecked semi-trailer and the ensuing chemical spill presents a number of legal issues.  In particular, it requires us to interpret an Iowa law, a lease agreement, and an insurance policy.

The plaintiff, an agricultural supply company that was delivering its own products, paid the bill for the ruined trailer and the cleanup, mostly through insurance.  However, because the supply company had been leasing the semi-tractor and its driver from another source, it brought suit against the lessors and their allegedly negligent driver in an attempt to shift the accident costs to them.  The district court granted summary judgment to the defendants.  It found that Iowa Code section 325B.1 (2011) and the lease terms barred any recovery by the supply company.

On appeal we now reverse.  We hold that section 325B.1 is intended to govern relations between authorized motor carriers and shippers and does not apply to this dispute.  We further hold that the lease terms can be reconciled and the indemnification provisions in the lease are valid and enforceable.  However, we also hold that the anti-subrogation rule limits potential recovery in this case because the driver is an insured under the supply company's insurance policy.  Accordingly, we reverse and remand for further proceedings consistent with this opinion.

### II.  Facts and Procedural Background.

This somewhat complicated insurance dispute arises out of relatively simple facts.

United Suppliers is a wholesale distributor of agricultural fertilizers and chemicals. It purchases its inventory in bulk, stores it in warehouses located in various states, and then sells it to retailers. Once sold, these products must be transported from United Suppliers' warehouses to its retail customers.

United Suppliers owns and operates 95 semi-tractors and 135 semi-trailers under the name Greenbelt Transport. These vehicles are used only to deliver the company's own inventory from the warehouse to the customer. United Suppliers does not offer transportation services for any purpose other than to deliver its own fertilizers and chemicals. It does not advertise transportation services. United Suppliers does add a delivery charge to the customer's price based on the distance traveled. These charges account for about five percent of United Suppliers' net profits. While its fertilizers and chemicals are in transit, United Suppliers bears the risk of loss.

Because United Suppliers' vehicle fleet and driver workforce are insufficient to meet its transportation needs, the company also enters into agreements with owner–operators and trucking companies. On or about October 5, 2010, United Suppliers entered into a one-year "Long Term Motor Vehicle Lease and Agreement" (the Lease) with Renny Hanson. Under the Lease, which was prepared by United Suppliers, Hanson agreed to provide a 2000 Freightliner semi-tractor and driver in return for a substantial percentage of the load revenue. The Lease stated that Hanson "shall maintain and service the vehicle[] above described[;] provide all fuel, oil, tires, and other equipment necessary[;] and pay driver['s] salary." The Lease further stated that Hanson

> d) Warrants (1) that driver[] furnished with such motor vehicle[] is . . . competent and qualified to operate said equipment, and meets all requirements of all laws, rules and

regulations[;] (2) that the said equipment is in good state of repair and (3) meets all the requirements of all applicable State and Federal Laws, rules and regulations of the Interstate Commerce Commission and the Public Service Commission[s] of the States, in, into or through which it is to be operated.

e) Agrees that [United Suppliers] shall not be liable for any loss or damage to or destruction of said leased vehicle[] while it is being operated by or is in the care and control of driver[] furnished therewith.

f) Agrees to indemnify [United Suppliers] against (1) any loss resulting from the injury or death of such driver[] and (2) any loss or damage resulting from the negligence, incompetence or dishonesty of such driver[.]

Additionally, the Lease provided that United Suppliers

a) Agrees that during the term of this lease, the said vehicle[] shall be solely and exclusively under the direction and control of [United Suppliers] who shall assume full carrier responsibility (1) for the loss or damage to cargo transported in such motor vehicle[] and (2) for the operation of such vehicle[].

Hanson personally owned the 2000 Freightliner semi-tractor that he leased to United Suppliers. Hanson also was the sole owner of a business known as R. Hanson Trucking Inc. (Hanson Trucking). Hanson and Hanson Trucking later admitted that the Lease was executed by Hanson individually and as president of Hanson Trucking.

Initially, Hanson himself drove the 2000 Freightliner pursuant to the Lease. However, in late March 2011, Hanson arranged for Hanson Trucking to hire Kenneth DiRisio as the driver for the vehicle. DiRisio signed an "Independent Contractor Agreement" with Hanson Trucking, and Hanson Trucking paid DiRisio a percentage of the revenue it received from United Suppliers for each load. United Suppliers required DiRisio to complete an "Application for Employment," performed a drug test and background check on him, and furnished logbooks and some instruction and training. During the spring of 2011, DiRisio transported

approximately forty to fifty loads for United Suppliers in the Freightliner without incident.

However, on June 9, DiRisio was driving the Freightliner and pulling a United Suppliers trailer loaded with United Suppliers fertilizers and chemicals. He was heading from United Suppliers' Eldora warehouse to another warehouse in Gibbon, Nebraska. While on Interstate 80 near Lincoln, Nebraska, DiRisio lost control of the tractor–trailer. The police report indicated that DiRisio was distracted when trying to change a CD and veered off the road. In deposition, DiRisio acknowledged he had been changing a CD but maintained he actually lost control of the vehicle when he looked up and had to swerve to avoid hitting a deer. Regardless, there is no dispute the vehicle went off the highway and overturned in a single-vehicle accident.

The trailer was wrecked in the accident. Making matters worse, the trailer's contents spilled out and rain dispersed them. The spill contaminated several hundred cubic yards of soil. A costly environmental cleanup was required.

United Suppliers suffered a loss totaling $974,366.20, primarily for the environmental remediation but also for the value of the trailer and its contents. United Suppliers' insurer, Nationwide Agribusiness Insurance Company (Nationwide), paid the entire loss except for a $5000 deductible.[1]

On February 19, 2013, United Suppliers—on behalf of itself and Nationwide—filed suit against Hanson, Hanson Trucking, and DiRisio in the Hardin County District Court. The petition had four counts:

---

[1]Nationwide paid $25,895.70 for the trailer, $88,970.00 for lost product, and $859,500.50 for remediation and related expenses.

(1) breach of contract—i.e., the Lease—against Hanson and Hanson Trucking, (2) negligence against DiRisio, (3) respondeat superior negligence against Hanson and Hanson Trucking, and (4) negligent hiring against Hanson and Hanson Trucking. The contract claim alleged, among other things, that Hanson and Hanson Trucking breached the Lease provision requiring them to indemnify United Suppliers for "any loss or damage resulting from the negligence or incompetence of the driver" they had provided.

In addition to answering and denying liability, Hanson, Hanson Trucking, and DiRisio filed a third-party petition against Nationwide. This petition sought a declaration that Hanson, Hanson Trucking, and DiRisio were insureds under the Nationwide policy, that Nationwide had a duty to defend and indemnify them, and that Nationwide could not seek subrogation from its own insureds.

The parties filed cross-motions for summary judgment on the question of whether Hanson, Hanson Trucking, and DiRisio were insureds under the Nationwide policy. That policy included a "Business Auto Coverage Form" which contained the following definition of an "insured":

1. Who Is An Insured

The following are "insureds":

a. You for any covered "auto."

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

> (1) The owner or anyone else from whom you hire or borrow a covered "auto."
>
> . . . .

c. Anyone liable for the conduct of any 'insured' described above but only to the extent of that liability.

The Nationwide policy also contained a "Truckers' Endorsement," which provided coverage "[f]or any operations [United Suppliers] engage[d] in as a 'trucker.'" The endorsement in turn defined "trucker" as "any person or organization engaged in the business of transporting property by 'auto' for hire."

In their summary judgment filings, Hanson, Hanson Trucking, and DiRisio argued they were covered under the Truckers' Endorsement. United Suppliers countered that the third-party plaintiffs were insured neither by the Truckers' Endorsement (because United Suppliers was not engaged in trucker operations) nor by the Business Auto Coverage (because someone "from whom you hire or borrow a covered 'auto'" cannot be an insured). The third-party plaintiffs did not assert at that time that they were insured under the Business Auto Coverage.

On January 15, 2014, the district court granted United Suppliers' summary judgment motion and denied the cross-motion of Hanson, Hanson Trucking, and DiRisio. The court found the Truckers' Endorsement in the Nationwide policy did not apply because United Suppliers was not engaged in trucker operations. It did not address the Business Auto Coverage, presumably because Hanson, Hanson Trucking, and DiRisio were not arguing at that time that it provided coverage for them. The court accordingly dismissed the third-party petition for declaratory judgment.

Hanson, Hanson Trucking, and DiRisio sought leave to file an interlocutory appeal.[2] We denied the application on March 5.

---

[2]No one disputed that the only appeal available was an interlocutory one, even though one party—Nationwide—was dismissed from the case. *See McGuire v. City of Cedar of Rapids*, 189 N.W.2d 592, 597 (Iowa 1971) ("In order to be severable, and therefore appealable, any determination of the issues settled by the judgment of dismissal must not affect the determination of the remaining issues, whether the

On June 23, Hanson, Hanson Trucking, and DiRisio moved for reconsideration of the district court's summary judgment order entered over five months earlier. Their motion urged that the district court had erroneously dismissed their declaratory judgment claim without addressing whether they were insureds under the Business Auto Coverage Form. Specifically, they insisted that the exception from the definition of "insured" for "[t]he owner or anyone else from whom [United Suppliers] hire[d] or borrow[ed] a covered 'auto'" did not apply to DiRisio. DiRisio, in their view, was neither the owner of the 2000 Freightliner, nor a person from whom United Suppliers hired or borrowed it. They further argued that the Hanson and Hanson Trucking were insureds under the next subparagraph in the Business Auto Coverage Form to the extent they were derivatively liable for DiRisio's conduct.

United Suppliers responded that the motion for reconsideration was untimely for two reasons: (1) the third-party plaintiffs had not filed a timely resistance to the summary judgment motion arguing coverage under the Business Auto Coverage Form; and (2) they had not filed a timely motion under Iowa Rule of Civil Procedure 1.904. United Suppliers also maintained that even if the court allowed the reconsideration motion and reached the merits, none of the third-party plaintiffs was an insured under the Business Auto Coverage Form.

Meanwhile, on May 29, United Suppliers had filed a motion for summary judgment on its petition, arguing that it was entitled to a determination as a matter of law that DiRisio had been negligent, that the claimed damages should be awarded, and that Hanson and Hanson

---

judgment on appeal is reversed or affirmed, and the determination of the remaining issues must not affect the final determination of the issues between the plaintiffs and the dismissed defendants." (quoting 4 Am. Jur. 2d *Appeal and Error* § 106 (1971))).

Trucking were also liable for DiRisio's negligence under respondeat superior and the terms of the Lease. Hanson, Hanson Trucking, and DiRisio responded that genuine issues of material fact existed. These included whether DiRisio was negligent and whether he was the agent of Hanson and Hanson Trucking—on the one hand—or United Suppliers—on the other. In a reply brief, United Suppliers maintained that agency was irrelevant in light of the Lease language requiring Hanson to indemnify United Suppliers for DiRisio's negligence or incompetence.

On August 11, the district court entered an order denying United Suppliers' motion for summary judgment.[3] The court's denial was based on a matter not raised by the defendants, namely the paragraph in the Lease providing United Suppliers had sole and exclusive "direction and control" of the vehicle and "assume[d] full carrier responsibility" for the operation of the vehicle. As the court explained,

> Plaintiff has focused only on the Lessor's agreement to indemnify Lessee against ". . . any loss or damage resulting from the negligence, incompetence or dishonesty of such driver(s)." Both parties seem to have completely ignored the Lessee's promises under the agreement to assume full carrier responsibility for the loss or damage to cargo and for the operation of the vehicle. They have also ignored the language " . . . during the term of this lease, the said vehicle(s) shall be solely and exclusively under the direction and control of the Lessee."
>
> . . . .
>
> . . . [T]he Court FINDS that the term "any loss or damage resulting from the negligence, incompetence or dishonesty of such driver(s)" refers to the sins of omission and commission of an unworthy employee, but does not include loss or damage from the operation of the vehicle. In paragraph d the Defendant warrants that the drivers furnished with the motor vehicle are competent and qualified to operate said equipment and meet all requirements of all

---

[3]A different judge was assigned to the case at this point.

applicable laws, rules and regulations. Then, in paragraph f Defendant agrees to indemnify Plaintiff if the drivers furnished are not as warranted. Obviously Plaintiff was demanding conscientious, capable and honest drivers. However, Plaintiff agreed that the operation of the vehicle would be solely and exclusively under its control, and that it would assume full carrier responsibility for the loss or damage to cargo and for the operation of the vehicle. Therefore, the loss or damage for which Defendant agreed to indemnify Plaintiff must necessarily relate to some other kind or type of loss or damage, which does not involve the operation of the vehicle.

The court raised additional concerns about the Lease sua sponte, including that the indemnification sought by United Suppliers would violate Iowa Code section 325B.1(2).[4] In closing, the court invited the parties "to file a motion for summary judgment on the contract issues, including the issues discussed above."

Following this order, Hanson, Hanson Trucking, and DiRisio moved for summary judgment in their favor, relying in part on the district court's interpretation of the Lease as outlined above. The defendants further argued that Iowa Code section 325B.1 invalidated any indemnification sought by United Suppliers under the Lease. United

---

[4]That subsection provides,

Notwithstanding any provision of law to the contrary, a motor carrier transportation contract, whether express or implied, shall not contain a provision, clause, covenant, or agreement that purports to indemnify, defend, or hold harmless, or has the effect of indemnifying, defending, or holding harmless, a promisee from or against any liability for injury, death, loss, or damage resulting from the negligence or intentional acts or omissions of that promisee, or any agents, employees, servants, or independent contractors who are directly responsible to that promisee. This prohibition applies to any provisions or agreements collateral to or affecting a motor carrier transportation contract. Any such provisions, clauses, covenants, or agreements are void and unenforceable. If any provision, clause, covenant, or agreement is deemed void and unenforceable under this section, the remaining provisions of the motor carrier transportation contract are severable and shall be enforceable unless otherwise prohibited by law.

Iowa Code § 325B.1(2).

Suppliers filed a renewed summary judgment motion of its own, as well as a resistance to the defendants' motion and a 1.904(2) motion to amend and enlarge the findings and conclusions of the court's August 11 order denying its motion for summary judgment.

On September 5, the court entered an order granting summary judgment to Hanson, Hanson Trucking, and DiRisio. The court concluded that: (1) the Lease between United Suppliers and Hanson was "a contract which is collateral to or affecting a motor vehicle contract"; (2) the Independent Contractor Agreement between Hanson Trucking and DiRisio was likewise "a contract collateral to or affecting a motor vehicle transportation contract"; (3) therefore, Iowa Code section 325B.1(2) invalidated the provision in the Lease entitling United Suppliers to indemnification for any negligence of the driver; and (4) "the remaining provisions of the [Lease] require [United Suppliers] to assume full carrier liability for the loss or damage to cargo and for the operation of the vehicle while it is solely and exclusively under [United Suppliers'] control." Hence, the court found that United Suppliers—either for its own benefit or on behalf of its insurer—could not recover from Hanson, Hanson Trucking, or DiRisio any of the losses arising out of the June 9, 2011 accident—regardless of DiRisio's alleged negligence. The court also deemed all the other pending motions—including the defendants' motion to reconsider the dismissal of the third-party complaint—moot and denied them on that basis.

United Suppliers appealed. We retained the appeal.

**III. Standard of Review.**

We review grants of summary judgment for correction of errors at law. *Robinson v. Allied Prop. & Cas. Ins. Co.*, 816 N.W.2d 398, 401 (Iowa 2012). "Summary judgment is appropriate when there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *accord* Iowa R. Civ. P. 1.981(3). We examine the record in the light most favorable to the nonmoving party. *Merriam v. Farm Bureau Ins.*, 793 N.W.2d 520, 522 (Iowa 2011).

### IV. Applicability of Iowa Code Section 325B.1.

This case requires us to interpret Iowa Code section 325B.1 for the first time. In relevant part, this section specifies a " '*motor carrier transportation contract*' means a contract, agreement, or understanding related to . . . [t]he transportation for hire of property by a motor carrier." Iowa Code § 325B.1(1)(*b*). The section goes on to provide that such a contract

> shall not contain a provision . . . that purports to indemnify . . . a promisee from or against any liability for injury, death, loss, or damage resulting from the negligence or intentional acts or omissions of that promisee, or any agents, employees, servants, or independent contractors who are directly responsible to that promisee.

*Id.* § 325B.1(2). Further, it adds that the foregoing "prohibition applies to any provisions or agreements collateral to or affecting a motor carrier transportation contract." *Id.*

A key point in construing the statute is the definition of "motor carrier." Section 325B.1 directs us to section 325A.1 for that definition. *Id.* § 325B.1(1)(*a*). Section 325A.1 in turn defines motor carrier as consisting of three types of "person[s]," all of which are engaged in transportation of property "for hire." *See id.* § 325A.1(6), (8)–(10).[5]

---

[5]These subsections provide, in relevant part:

> 6. "*Motor carrier*" means a person defined in subsection 8, 9, or 10.

>     . . . .

However, a person who "transports commodities of which the person is the owner, lessee, or bailee and the transportation is a furtherance of the person's primary business or occupation" is a "private carrier." *Id.* § 325A.1(13).

As noted, the district court found that Iowa Code section 325B.1 prohibited United Suppliers from being indemnified for the driving negligence of DiRisio. The court reasoned that the statute applied to the Lease, and further concluded that United Suppliers was a "promisee" and DiRisio was a person "directly responsible" to United Suppliers within the terms of the statute.

United Suppliers argues the district court erred in its reading of the statute. In United Suppliers' view, the statute simply has no applicability here because the Lease with Hanson was not an agreement related to "[t]he transportation for hire of property by a motor carrier."

_____

8. "*Motor carrier of bulk liquid commodities*" means a person engaged in the transportation, for hire, of bulk liquid commodities upon a highway in this state.

9. "*Motor carrier of household goods*" means a person engaged in the transportation, for hire, of personal effects and property used or to be used in a dwelling, and includes the following:

*a.* Furniture, fixtures, equipment, and the property of stores, offices, museums, institutions, hospitals, or other establishments when a part of the stock, equipment, or supply of such establishment; except, this paragraph shall not be construed to include the stock-in-trade of any establishment, except when transported as an incident to the removal of the establishment from one location to another.

*b.* Articles including objects of art, displays, and exhibits, which because of their unusual nature or value, require the specialized handling and equipment usually employed in moving household goods.

10. "*Motor carrier of property*" means a person engaged in the transportation, for hire, of property by motor vehicle including a carrier transporting liquid commodities or compressed gases in a vehicle having a total cargo tank shell capacity of two thousand gallons or less.

*Id.* § 325A.1(6)–(10).

*See id.* § 325B.1(1)(*b*). United Suppliers points out that, in the Lease, it was not agreeing to transport Hanson's or anybody else's property. Rather, the Lease enabled United Suppliers to add to its stock of semi-tractors and drivers. Further, United Suppliers argues that it was a private carrier rather than a motor carrier because it only transported its own property in furtherance of another business. In sum, United Suppliers views the statute as governing the relationship between carriers and shippers, not the relationship between an entity that supplies vehicles and drivers and an entity that borrows those vehicles and drivers so it can deliver goods from its own inventory.

On the other hand, Hanson, Hanson Trucking, and DiRisio defend the district court's broader view of Iowa Code section 325B.1. They contend that the Lease—at a minimum—was "collateral to or affecting" an agreement to transport property to hire, since it enabled United Suppliers to transport additional fertilizer and chemicals and receive compensation for doing so. *See id.* § 325B.1(2). They argue that United Suppliers was a promisee and that Hanson, Hanson Trucking, and DiRisio were "agents, employees, servants, or independent contractors who [were] directly responsible to that promisee." *Id.*

It is clear that the Lease itself is *not* a motor carrier transportation contract, a point acknowledged by the district court. However, the district court found that the Lease was "related to," "collateral to," or "affecting" a motor carrier transportation contract. *Id.* This conclusion, though, rests on the premise that United Suppliers was a motor carrier that entered into transportation contracts with its customers. If United Suppliers did not meet Iowa Code section 325A.1's definition of a motor carrier, section 325B.1 cannot apply here.

We will assume for present purposes that Iowa Code section 325A.1 has some modicum of ambiguity. Even so, we must begin with the statutory language. *See In re A.M.*, 856 N.W.2d 365, 371 (Iowa 2014) ("Our starting point is the statutory text."). Iowa Code section 325A.1 establishes two classifications—motor carrier and private carrier. Although the section does not expressly say they are mutually exclusive, that is the logical reading of the statute. Because the term private carrier is not used elsewhere in the chapter, the only reason to define it in section 325A.1 is to make clear that it is something different from a motor carrier.[6] According to section 325A.1, a motor carrier is "engaged in the transportation, for hire," of goods or property. *See* Iowa Code § 325A.1(8)–(10). A private carrier, on the other hand, includes a person who "transports commodities of which the person is the owner, lessee, or bailee and the transportation is a furtherance of the person's primary business or occupation." *Id.* § 325A.1(13).

Chapter 325A was enacted in 1997 when there was already a considerable body of judicial precedent on private as opposed to for-hire carriage. *See* 1997 Iowa Acts ch. 104, §§ 32–56 (codified at Iowa Code §§ 325A.1–.26). "We have often indicated we presume the legislature was aware of our decisions when it crafted new statutes." *Roberts Dairy v. Billick*, 861 N.W.2d 814, 821 (Iowa 2015); *see also* Iowa Code § 4.6(2), (4) (indicating that when interpreting an ambiguous statute, we may consider "[t]he circumstances under which the statute was enacted" and "[t]he common law"). Our precedents had historically recognized the distinction between a common carrier and a private carrier. *See, e.g.,*

---

[6]*See* Iowa Code § 4.4(2) (setting forth a presumption that "[t]he entire statute is intended to be effective"); *Thomas v. Gavin*, 838 N.W.2d 518, 524 (Iowa 2013) ("Normally we do not interpret statutes so they contain surplusage.").

*Wright v. Midwest Old Settlers & Threshers Ass'n*, 556 N.W.2d 808, 810–11 (Iowa 1996).  For example, in *Wright,* we were asked to decide whether an association that operated a train to shuttle guests around an annual fair-type event put on by the association was a "common carrier" for purposes of the duty of care.  *Id.* at 809–10.  We explained that "Iowa law adheres to a common law test for determining whether a particular conveyance is a common carrier or private carrier."  *Id.* at 810.  We then found as a matter of law that the association's train operations fell into the latter category rather than the former:

> In the present case, the association's event is limited in scope and duration to only a few days each year.  Its main business is not to transport all people from one area to another, but rather to entertain those who have paid a fee to attend.  Patrons are ferried around the area by a train for which they have paid an additional fee.  The purpose of this train is not only to provide transportation around the grounds, but also to entertain the public.  Only those who have paid the additional fee may use the train.  The association does not hold itself out to the public as being in the business of carrying passengers for hire.

*Id.* at 811; *see also State ex rel. Bd. of R.R. Comm'rs v. Rosenstein*, 217 Iowa 985, 987–88, 992–93, 252 N.W. 251, 253, 255 (1934) (rejecting the claim by the owner of a truck who transported theatrical films and advertising to theaters for compensation that he was a private carrier, despite the owner's claim that he was a private carrier because he had organized an association to which most of the theaters belonged and that purported to operate the truck, although the association never had any meetings and had no officers).

Furthermore, since chapter 325A regulates motor carriers, it is quite plausible that our legislature intended to track the generally-recognized distinction from federal law between carriers that are subject to regulation and unregulated private carriers.  This distinction has been

based for years on the so-called "primary business test" that was developed by the Interstate Commerce Commission and approved by Congress and the United States Supreme Court. *See Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. 311, 313–19, 84 S. Ct. 1260, 1262–65, 12 L. Ed. 2d 341, 343–47 (1964).[7]  In the present case, the district court relied on this test when it initially ruled that United Suppliers was not a trucker under the Nationwide policy because it was not "engaged in the business of transporting property by 'auto' for hire."  As the district court noted in that ruling, "States have appropriated the primary business test to determine a carrier's 'for hire' or 'private carrier' status in a variety of circumstances . . . ." *See, e.g., A.G.G. Enters., Inc. v. Washington County*, 145 F. Supp. 2d 1215, 1222 (D. Or. 2001) ("The primary business test . . . determines if the transportation is within the scope and in the furtherance of a primary business enterprise other than transportation."); *Frohardt v. Bassett*, 788 N.E.2d 462, 468 (Ind. Ct. App. 2003) ("*Red Ball* distinguishes a 'for-hire' carrier from a 'private' carrier by explaining that, in order to be considered 'for hire,' a carrier's primary business must be supplying transportation for compensation."); *Grouse Mountain Assocs., Ltd. v. Mont. Dep't of Pub. Serv. Regulation*, 943 P.2d 971, 975–77 (Mont. 1997) (finding that a resort's provision of

---

[7]As the Supreme Court pointed out, the primary business test was developed to avoid "subterfuges which might be employed to engage in unauthorized for-hire transportation," such as having the carrier temporarily take title while the goods were being transported and other varieties of "pseudo-private carriage." *Red Ball*, 377 U.S. at 313–16, 84 S. Ct. at 1262–63, 12 L. Ed. 2d at 344–45.

Federal law now codifies this test. *See* 49 U.S.C. § 13505(a) (2012) ("Neither the Secretary nor the Board has jurisdiction under this part over the transportation of property by motor vehicle when—(1) the property is transported by a person engaged in a business other than transportation; and (2) the transportation is within the scope of, and furthers a primary business (other than transportation) of the person.").

transportation to its guests was exempt from regulation under the primary business test).

When courts in other jurisdictions have applied the primary business test to fact patterns similar to the one before us, they have routinely found that the carrier was engaged in private rather than for-hire transportation. Thus, in *Progressive Northwestern Insurance Co. v. Martinez*, the court relied on the primary business test to determine that a sand and gravel excavator that made its own deliveries and charged for them, but did not transport materials for other suppliers, was not a carrier for hire. 956 P.2d 845, 846–47 (N.M. Ct. App. 1998). In *Gambino v. Jackson,* the court found an individual who sold and delivered agricultural lime was

> a private carrier and not a common or contract carrier. He was engaged in the business of selling lime which he had purchased for that purpose. He was not paid for the transfer thereof but sold it for the same price, regardless of whether he delivered it one mile or twenty miles. Neither did he ever haul lime for hire.

145 S.E.2d 124, 129 (W. Va. 1965). Utilizing the primary business test, the court concluded that "the transportation of lime by Jackson was within the scope, and in furtherance, of a primary business enterprise. . . . Jackson was a private carrier of lime, pursuant to and in furtherance of his business of buying and selling agricultural lime . . . ." *Id.* at 130.

The primary business test comes with a series of factors. In *Admiral Disposal Co. v. Department of Revenue*, an Illinois appellate court applied these factors in determining that a garbage collection company was a private carrier rather than a carrier for hire. 706 N.E.2d 118, 121–

23 (Ill. App. Ct. 1999).[8]  The court thus cited twelve criteria "for evaluating the primary business test's application to a specific case":

>    1.  Whether the carrier is the owner of the property transported.
>
>    2.  Whether orders for the property are received prior to its purchase by the carrier.
>
>    3.  Whether the carrier utilizes warehousing facilities and the extent of this use as a storage place.
>
>    4.  Whether the carrier undertakes any financial risks in the transportation-connected enterprise.
>
>    5.  Whether the carrier includes in the sale price an amount to cover transportation costs and its relation to the distance the goods are transported.
>
>    6.  Whether the carrier transports or holds out to transport for anyone other than itself.
>
>    7.  Whether the carrier advertises itself as being in a noncarrier business.
>
>    8.  Whether its investment in transportation facilities and equipment is the principal part of its total business investment.
>
>    9.  Whether the carrier performs any real service other than transportation from which it can profit.
>
>    10.  Whether the [carrier] at any time engages for-hire carriers to effect delivery of the products, as might be expected, for example, when it is called upon to fill an order and its own equipment is otherwise engaged.

---

[8]Notably, Illinois has a statutory definition of private carrier similar to Iowa's:

> [A]ny person engaged in the transportation of property or passengers by motor vehicle other than for hire, whether the person is the owner, lessee or bailee of the lading or otherwise, when the transportation is for the purpose of sale, lease, or bailment and in furtherance of the person's primary business, other than transportation.

*Admiral Disposal,* 706 N.E.2d at 121 (quoting 625 Ill. Comp. Stat. 5/18c-1104(27) (1996)).

11. Whether the products are delivered directly from the shipper to the consignee (*i.e.,* without intermediate warehousing).

12. Whether solicitation of the order is by the supplier rather than the truck owner.

*Id.* at 121 (quoting *Russell v. Jim Russell Supply, Inc.,* 558 N.E.2d 115, 125–26 (Ill. App. Ct. 1990)). The court concluded, "[T]he actual transportation of refuse was merely incidental to Admiral's business as a refuse collector." *Id.* at 122.

Based on the foregoing, we believe the language of Iowa Code section 325A.1, the Iowa precedents we have discussed, and non-Iowa authority all pull in the same direction, namely, that United Suppliers is not a motor carrier. Rather, it is a private carrier.

The summary judgment record confirms that United Suppliers fits the private-carrier definition. United Suppliers only hauls its own fertilizer and chemicals. And this hauling is secondary to the company's fertilizer and chemical business; it represents about five percent of profits. Thus, United Suppliers "transports commodities of which [it] is the owner, lessee, or bailee and the transportation is a furtherance of [its] primary business or occupation." Iowa Code § 325A.1(13).

It is true that United Suppliers receives "compensation" for transportation, which is one aspect of the motor carrier definition. *See id.* § 325A.1(14) (" '*Transportation for hire*' means all transportation of property or passengers made available by a person for compensation."). But the phrase "made available" in the definition is ambiguous, and the entire definition needs to be read in the context of the entire statute, including the definition of private carrier in section 325A.1(13). United Suppliers does not make transportation of property "available" in the sense that one can buy transportation of property from United Suppliers

as a separate service; one can only buy products from United Suppliers and then ask the company to deliver them.

Caselaw predating Iowa Code sections 325A.1 and 325B.1 bolsters this common-sense reading of the statute. Like the association that operated a train to shuttle guests around its annual event, the sand and gravel company that used a dump truck to deliver its own sand and gravel, and the agricultural lime seller that delivered its own lime, United Suppliers only provides transportation incidental to another primary business. *See Wright*, 556 N.W.2d at 811; *Martinez*, 956 P.2d at 846–47; *Gambino*, 145 S.E.2d at 129. Of the twelve factors noted in *Admiral Disposal Co.*, only one—"[w]hether the carrier includes in the sale price an amount to cover transportation costs and its relation to the distance the goods are transported"—arguably supports "for hire" carrier status. *See* 706 N.E.2d at 121.

In addition, if Iowa Code section 325B.1 applied here, this would result in an anomalous situation where one party (United Suppliers) would be *prohibited* from contractually requiring a second party (Hanson or Hanson Trucking) to bear the costs of the second party's *own* negligence in selecting the driver it provided. Moreover, the second party could not be required to bear the costs of *the negligence of its own agent* (if in fact DiRisio is the agent of Hanson and Hanson Trucking). These outcomes do not make for sound public policy and grind against the gears of our common law. *See* Iowa Code § 4.4(3) (setting forth the presumption that in enacting a statute, "[a] just and reasonable result is intended"); *McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 571 (Iowa 2002) ("[I]ndemnification contracts will not be construed to permit an indemnitee to recover for its own negligence

unless the intention of the parties is clearly and unambiguously expressed.").[9]

One more point: We should consider the legislature's goal in enacting section 325B.1 in 2010. *See* 2010 Iowa Acts ch. 1155, § 1 (codified at Iowa Code § 325B.1); Iowa Code § 4.6(1) (noting that when a statute is ambiguous, the court may consider "[t]he object sought to be attained"). This provision was part of a national trend in state legislatures to pass laws preventing shippers from transferring liability for their own negligence to carriers and vice versa. *See Kruis v. Allmine Paving, LLC*, No. 3:13–CV–25, 2013 WL 5557484 at *4–5 (N.D. W. Va. Oct. 8, 2013) ("The [contractual] indemnity provision is not void and unenforceable under the Missouri or West Virginia statute because it does not require Mitchell to indemnify, defend, and hold harmless Allmine for Allmine's negligence, intentional acts, or omissions. Indeed, Allmine is responsible for its own negligence . . . ."). A few years ago, in the context of resolving a shipper–carrier dispute, a federal court discussed Indiana's comparable legislation. *Illini State Trucking, Inc. v.*

---

[9]The district court took the position that its interpretation of Iowa Code section 325B.1 *furthered* public policy because "[t]he carrier is in the best position to assess and insure against the risks being assumed by the transportation of cargo." The risk in question here was that DiRisio would engage in distracted driving. That is the specific allegation in this case. Although the record indicates that United Suppliers performed some screening and provided some training to DiRisio, it is not clear to us why United Suppliers would be in a better position to absorb the risk of DiRisio's distracted driving than DiRisio himself or Hanson and Hanson Trucking—the parties that selected DiRisio to drive the semi.

The defendants also assert that United Suppliers is "a large operation." However, we do not believe the relative size of United Suppliers and Hanson Trucking should drive the analysis. Typically our rules of law do not vary with the size of the litigants. In any event, the record indicates that the defendants—like United Suppliers—had insurance, although it does not disclose the specifics of their policy. This case may be, for the most part, a contest between two insurers.

*Carmeuse Lime, Inc.*, No. 2:10–CV–21–PRC, 2012 WL 162538, at *3–4 (N.D. Ind. Jan. 18, 2012). That court observed,

> The indemnity provision in Paragraph 12.2 of the parties' Agreement invoked by Illini in its Counterclaim is not void and unenforceable under the statute because the promisee is not being indemnified for its own negligence. Paragraph 12.2 does not require Carmeuse to indemnify, defend, and hold harmless *Illini* for *Ilini's* negligence, intentional acts, or omissions. Rather, Paragraph 12.2 requires Carmeuse to indemnify, defend, and hold harmless *Illini* (the promisee) for *Carmeuse's* (the promissor) negligence, intentional acts, or omissions. Thus, the indemnity provision in Paragraph 12.2, on its face, is not void or unenforceable . . . .

*Id.* at *4. In a footnote, the court indicated that the Indiana law was enacted in response to "the history of indemnity provisions in motor carrier agreements in which a motor carrier was required to indemnify a shipper for the shipper's own negligence." *Id.* at *4 n.1.

Recently, New Jersey enacted similar legislation. *See* N.J. Rev. Stat. § 39:14-1 (2015). The supporting statement for the legislation explained,

> More than 30 states have adopted anti-indemnification laws. Many motor carrier transportation contracts have broad indemnity clauses, some of which indemnify the promisee even in cases where the promisee's negligence, intentional acts, or omission may have caused or contributed to an accident or injury. This bill makes void any provision in a motor carrier transportation contract that indemnifies the promisee from liability when the loss or damage was the result of the promisee's negligence, intentional act, or omission.

S. 1380, 216th Leg., 1st Sess. (N.J. 2014). Viewed through this national lens, the Lease between United Suppliers and Hanson seems far afield from the concerns the legislature apparently intended to address in adopting Iowa Code section 325B.1.

For all these reasons, we conclude that United Suppliers is a private carrier rather than a motor carrier, and therefore section 325B.1 has no applicability.

## V. Interpretation of the Lease.

Even though we have concluded that Iowa Code section 325B.1 does not apply to the Lease, we still must determine what the Lease means *on its own.* Does it require United Suppliers, on the one hand, or Hanson, Hanson Trucking, and DiRisio, on the other, to bear the costs of the June 9, 2011 accident, including the environmental cleanup? Or does that depend on the facts?

Two provisions of the Lease are at issue. One says the semi-tractor

> shall be solely and exclusively under the direction and control of [United Suppliers] who shall assume full carrier responsibility (1) for the loss or damage to cargo transported in such motor vehicle[] and (2) for the operation of such vehicle[].

The other provides that Hanson "[a]grees to indemnify [United Suppliers] against (1) any loss resulting from the injury or death of [DiRisio] and (2) any loss or damage resulting from the negligence, incompetence or dishonesty of such driver[]." Our present task is to "reconcile and give proper effect to arguably conflicting terms." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 729 (Iowa 2014).

United Suppliers urges that the provisions can be reconciled by recognizing that the "full carrier responsibility" provision governs United Suppliers' obligations to the outside world, whereas the indemnity provision controls the relations between the lessee (United Suppliers) and the lessor (Hanson and Hanson Trucking). Hanson and Hanson Trucking take a different view. They maintain that the Lease should be

harmonized by holding that they are only "obligated to indemnify loss relating to the competency and honesty of [DiRisio]"—*not* his negligence.

"Ordinarily, indemnifying agreements will be enforced according to their terms, as in any other contract case." *Martin & Pitz Assocs., Inc. v. Hudson Constr. Servs., Inc.*, 602 N.W.2d 805, 808 (Iowa 1999); *see also McNally*, 648 N.W.2d at 571 ("A contract for indemnification is generally subject to the same rules of formation, validity and construction as other contracts.").

However, two rules of interpretation aid the defendants here. First:

> [W]here an indemnification is not given by one in the insurance business but is given incident to a contract whose main purpose is not indemnification, the indemnity provision must be construed strictly in favor of the indemnitor.

*Martin & Pitz Assocs.*, 602 N.W.2d at 809 (quoting 41 Am. Jur. 2d *Indemnity* § 13 (1995)). Second, "an indemnity contract is strictly construed against the drafter." *Id.*

While these rules favor the defendants, the defendants' interpretation of the Lease suffers from a more serious infirmity. Basically, it asks us to disregard the clear language making Hanson and Hanson Trucking responsible for DiRisio's driving negligence. United Suppliers' interpretation, by contrast, offers a path to actual harmonization. *See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

Furthermore, the Lease language, like Iowa Code section 325B.1, was not written on a blank slate. A survey of caselaw indicates that both types of clauses in this Lease have been used frequently when one carrier

lends equipment-plus-driver to another carrier. There is a reason for this. Under federal regulations, any lease of equipment to an authorized carrier must include the following exclusive-control terms:

> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1) (2010). "Contracting parties are presumed to contract in reference to the existing law, which becomes a part of the contract." *In re Receivership of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 134 (Iowa 1988). Hence, the exclusive control language in the Lease appears to have its genesis in federal law.

In 1975, the United States Supreme Court essentially dealt with the interpretive situation presented here. In that case, one carrier had leased equipment and a driver from another carrier. *See Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28, 30, 96 S. Ct. 229, 230–31, 46 L. Ed. 2d 169, 173 (1975). As here, the lease contained both (1) a paragraph tracking the federal regulation on the lessee's (Transamerican's) control and responsibility over the leased equipment and (2) a paragraph requiring the lessor (Brada Miller) to indemnify the lessee for any losses sustained due to the negligence of the lessor or the lessor's agents or employees. *Id.* at 31, 96 S. Ct. at 231, 46 L. Ed. 2d at 173. An accident later occurred, allegedly due to the negligence of the driver provided by the lessor. *Id.* at 32, 96 S. Ct. at 231, 46 L. Ed. 2d at 174. The lessee settled with the injured party and sought indemnification from the lessor. *Id.* The lessor (Brada Miller) defended on the ground that the indemnification provision was unenforceable because it conflicted with the federal regulation requiring

the lessee to assume exclusive responsibility. *Id.* at 32–35, 96 S. Ct. at 231–33, 46 L. Ed. 2d at 174–76.

The Supreme Court rejected the lessor's defense. *Id.* at 40, 96 S. Ct. at 235, 46 L. Ed. 2d at 179. It held the indemnification provision did not conflict with the federally-required lease provision. *Id.* at 38–40, 96 S. Ct. at 234–35, 46 L. Ed. 2d at 177–79. As the Court put it,

> We readily conclude . . . that the two provisions are not in conflict and that the indemnification clause does not impinge upon the requirements of the lease and of § 1057.3(a) [now 376.12(c)(1)] that operational control and responsibility be in the lessee. Paragraph 4 of the lease is, of course, express and clear. The parties agreed in writing that "the control and responsibility for the operation of said equipment" were in Transamerican, as lessee. This is what § 1057.3(a) requires and it is all that it formally requires. Moreover, added to the bare words of assumption of control and responsibility, was the specification that this was directed "to the public, shippers and Interstate Commerce Commission." The separate indemnification clause in the subsequent paragraph 9 of the lease did not affect this basic responsibility of the lessee to the public; it affected only the relationship between the lessee and the lessor.

*Id.* at 38–39, 96 S. Ct. at 234, 46 L. Ed. 2d at 177–78. In sum, the Supreme Court resolved the apparent inconsistency in lease terms the same way United Suppliers urges us to do so here.

Subsequently, in *Gateway Transportation Co. v. Phillips & Phillips Co.*, 261 N.W.2d 175, 178 (Iowa 1978), our court applied the Supreme Court's *Transamerican* decision. That case likewise involved a carrier (Gateway) that had leased equipment and a driver from another carrier. *Id.* at 176. While the leased driver was operating the leased tractor–trailer on behalf of Gateway, a fatal collision occurred, allegedly due to the negligence of the driver. *Id.* Gateway settled the claim and then sought indemnification. *Id.* The equipment trip lease required the lessor (Phillips) to indemnify Gateway for the negligence of Phillips's driver. *Id.*

at 178. The trial court, however, found that this indemnity provision was illegal and contrary to public policy because federal regulations required the lessee to have "exclusive control over leased equipment and borrowed drivers." *Id.* at 178. On the authority of *Transamerican*, we reversed. *Id.* We noted,

> The Supreme Court held such terms do not offend against public policy as long as the lessee remains initially responsible to the public and to shippers. If this condition is met—and it is in the present case—the fact that Gateway contracted with others to indemnify it against loss is not contrary to public policy.

*Id.*

Relying on *Transamerican* and its progeny, courts in other jurisdictions have continued to rule that provisions making the lessee fully responsible and provisions requiring the lessor to indemnify the lessee can cohabit comfortably in the same lease. The exclusive-control-and-responsibility provision is intended to benefit the public by making clear that the public may recover from the lessee in the event of a mishap. Meanwhile, the indemnity provision covers relations between the lessee and the lessor and authorizes the lessee to obtain indemnification from the lessor.

An example of this is *Reid v. Bootheel Transportation Co.*, 771 F. Supp. 237 (N.D. Ill. 1991). In that case, Interstate had leased a tractor–trailer with a driver, Mays, from Bootheel. *Id.* at 238. Thereafter the leased vehicle collided with a van driven by plaintiff Reid. *Id.* Interstate's insurer settled with Reid and then sought recovery from Bootheel. *See id.* at 239. Bootheel moved for summary judgment on the ground that the lease's indemnification clause was "inconsistent with the [l]ease as a whole." *Id.* at 240. The parties stipulated that Interstate had prepared the lease. *Id.* Nonetheless, the court denied Bootheel's motion and

granted Interstate's cross-motion for summary judgment. *Id.* at 240–42. The court found that under *Transamerican,* "the indemnification provision in the [l]ease is not in conflict with the [l]ease provision requiring Interstate, the lessee, to assume operational responsibility and control for the leased tractor and trailer." *Id.* at 241. "Reviewing the [l]ease as a whole, the court finds that the . . . operational control and responsibility[] and indemnification provisions of the [l]ease are consistent, and . . . can be given effect together." *Id.* The court added, "The [l]ease's requirement[] that Interstate . . . assume operational control over and responsibility for the leased tractor and trailer, do[es] not relieve Bootheel's contractual obligation to indemnify Interstate for loss or damage resulting from Mays's negligence or incompetence." *Id.* at 241–42; *see also Malone v. Barnette*, 772 S.E.2d 256, 263 (N.C. Ct. App. 2015) ("Enforcement of the indemnity provision in the present case does not leave victims of the alleged negligent acts of Young's without financial recourse. Instead, it merely shifts the financial responsibility for such negligence from one entity to another.").[10]

Accordingly, we find that Hanson and Hanson Trucking's obligations under Lease paragraphs (d), (e), and (f) quoted above, including the obligation to "indemnify [United Suppliers] against . . . any

---

[10]In the present case, federal law may not require the Lease to contain an exclusive responsibility provision. As we have already discussed, United Suppliers acts as a private carrier when it transports its own goods. *See* 49 U.S.C. § 13505(a) (provision in subchapter I of chapter 135) (exempting private carrier business from federal regulation); *id.* § 14102(a) (limiting federal regulation of leases to carriers that are subject to federal "jurisdiction under subchapter I of chapter 135"); *see also* 49 C.F.R. § 376.11 (imposing lease requirements on "authorized carrier[s]"). Furthermore, United Suppliers appears to have used a form that is considerably dated, since it mentions the "Interstate Commerce Commission," which ceased to exist in 1995. *See* ICC Termination Act of 1995, Pub. L. No. 104-88, § 101, 109 Stat. 803, 804. This does not alter our analysis, however, of whether and how the two provisions in the Lease can be reconciled.

loss or damage resulting from the negligence, incompetence or dishonesty of [DiRisio]," are enforceable and not qualified by paragraph (a) quoted above, which states that United Suppliers "shall assume full carrier responsibility . . . for the operation of" the 2000 Freightliner. We are not asked to decide and do not decide the ultimate question of whether an actual duty to indemnify has arisen, for example based on DiRisio's negligence.

### VI. The Anti-Subrogation Rule.

"The insurer has no right of subrogation against the insured." *Allied Mut. Ins. Co. v. Heiken,* 675 N.W.2d 820, 824 (Iowa 2004). Hanson, Hanson Trucking, and DiRisio invoke this principle to limit any potential recovery by United Suppliers, noting that all but $5000 of United Suppliers' claim is a subrogation claim for the benefit of Nationwide. The defendants insist they are *also* insureds under the Nationwide policy and, therefore, subrogation recovery is not available. The district court's grant of summary judgment to Hanson, Hanson Trucking, and DiRisio rendered this issue moot, but our reversal of that summary judgment revives this controversy.

The guidelines we follow when interpreting insurance policies are familiar ones. "If the policy is ambiguous, we adopt the construction most favorable to the insured." *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 502 (Iowa 2013). Also, "we strictly construe exclusions against the insurer." *Id.* However, "[i]f an insurance policy and its exclusions are clear, the court 'will not "write a new contract of insurance" ' for the parties." *Id.* (quoting *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 682 (Iowa 2008)).

At the outset, Hanson, Hanson Trucking, and DiRisio argue they are insureds on account of the Truckers' Endorsement to the Nationwide

policy. We disagree. For the reasons already discussed in Part IV of this opinion, United Suppliers is not engaged in trucker operations, defined in the policy as "the business of transporting property by 'auto' for hire." Therefore, the endorsement does not apply.[11]

Alternatively, Hanson, Hanson Trucking, and DiRisio argue they are insureds under the Business Auto Coverage Form of the Nationwide policy. They maintain that DiRisio qualifies as an insured because he was using the 2000 Freightliner with United Suppliers' permission, it was a hired or borrowed vehicle, and DiRisio was not "[t]he owner or anyone else from whom [United Suppliers] hire[d] or borrow[ed] a covered 'auto.'" Moreover, if DiRisio is an insured, Hanson and Hanson Trucking urge they are also insureds for any derivative liability for DiRisio's conduct. That is because the form provides coverage for "[a]nyone liable for the conduct of an 'insured' described above but only to the extent of that liability."

United Suppliers' first-line response is that these contentions were not preserved below. It points out correctly that when the parties filed cross-motions for summary judgment on the coverage question, the defendants did not invoke the Business Auto Coverage Form, only the Truckers' Endorsement. In fact, Hanson, Hanson Trucking, and DiRisio did not assert coverage under the Business Auto Coverage Form until they filed a motion for reconsideration five months after the district court

---

[11]The defendants contend that this reading of the Truckers' Endorsement renders the endorsement "superfluous." *See Boelman*, 826 N.W.2d at 502 ("We will not interpret an insurance policy to render any part superfluous . . . ."). This is not quite correct. The Truckers' Endorsement still provides *additional* coverage. It may not be coverage that United Suppliers needs for its current business operations, but that is a separate matter. It is certainly not unprecedented for businesses and individuals to purchase more insurance coverage than they actually need.

had granted partial summary judgment to United Suppliers on the policy interpretation issues on January 14, 2014.

However, under the special circumstances present here, we believe the question of interpretation of the Business Auto Coverage Form is properly before us. When the district court granted the defendants summary judgment in the entire case based on Iowa Code section 325B.1, this September 5 ruling necessarily determined that United Suppliers was a for-hire carrier. Thus, the September 5 ruling effectively nullified the earlier January 14 ruling by a different judge that United Suppliers was *not* engaged in transportation for hire for insurance purposes. Of course, the January 14 ruling interpreting the Nationwide policy was interlocutory and could have been revisited by the district court at any time. For all practical purposes, that is what the court did on September 5.

We have now concluded that the September 5 section 325B.1 ruling was erroneous and must be reversed. Since the September 5 ruling had negated the January 14 ruling, this puts the parties back at the starting-line as far as summary judgment motions are concerned. Accordingly, we now turn to the meaning of the Business Auto Coverage Form.

Both parties have extensively briefed the meaning of this form. Yet despite this briefing, neither side has located much in the way of pertinent authority. United Suppliers comes the closest, drawing our attention to the Georgia Court of Appeals' decision in *Park Pride Atlanta, Inc. v. City of Atlanta*, 541 S.E.2d 687 (Ga. Ct. App. 2000). In that case, a Park Pride volunteer was killed, and her husband was seriously injured when a City of Atlanta employee negligently operated a dump truck that was owned by the city and that had been furnished with its driver to

Park Pride. *Id.* at 688. The city made a tort settlement with the volunteer's husband and then sought indemnification from Park Pride and its insurer. *Id.* As here, the insurance policy had a coverage exception for "the owner or anyone else from whom you hire or borrow a covered 'auto.'" *Id.* at 691. The city sought a summary judgment that it was an insured under the policy, and the trial court denied the city's motion. *Id.* at 689.

The court of appeals affirmed the denial. *Id.* at 691. Unfortunately for present purposes, the court's opinion did not focus on the policy language. *See id.* Thus, the court did not explain why the coverage exception would apply to a driver who was not actually "the owner or anyone else from whom [Park Pride] hire[d] or borrow[ed]" the dump truck. *See id.* Instead, the court relied heavily on testimony from Park Pride's insurance broker that the policy was not "designed" to cover city vehicles when operated by city employees. *Id.* Because the *Park Pride* decision appears to be driven by fact-specific testimony rather than the terms of the insurance policy, we find it of limited value in our analysis.

Instead, we find another decision of the same court to be more pertinent. *See Nationwide Mut. Ins. Co. v. Holbrooks*, 371 S.E.2d 252 (Ga. Ct. App. 1988). In that case, Campana—an employee of Holbrooks—was driving a truck that Holbrooks had leased to Apache Transport. *Id.* at 252–53. Allegedly, Campana crossed the center line while driving the vehicle and caused a fatal collision. *Id.* at 253. Nationwide, Apache's insurer, brought a declaratory judgment action to determine whether its policy provided coverage for the collision. *Id.* at 252–53. The trial court found that Campana and Holbrooks were insureds and entered summary judgment against Nationwide. *Id.* at 253. The Georgia Court of Appeals affirmed. *Id.* at 257.

Importantly, when addressing the coverage exclusion for "[t]he owner or anyone else from whom you hire or borrow a covered auto," the court said that "it does not apply at all to Campana because Apache did not hire or borrow the vehicle from Campana." *Id.* at 256 (emphasis omitted). And notably, unlike the later *Park Pride* decision, this decision centered on the actual policy terms. *Id.*

Moreover, as we scour for relevant caselaw, we have found insurance policies with broader exceptions than the present policy that clearly would have denied coverage to a person in the position of DiRisio. *See Canal Indem. Co. v. Rapid Logistics, Inc.*, 514 F. App'x 474, 478 (5th Cir. 2013) (noting the policy provides coverage for "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow except . . . [t]he owner, *or any employee, agent or driver* of the owner, or anyone else from whom you hire or borrow a covered 'auto'" (emphasis added)); *Daniel v. Nat'l Cas. Ins. Co.*, ___ F. Supp. 3d ___, ___, 2015 WL 5694287, at *11 (D. Md. Sept. 25, 2015) (noting the policy covered "[a]nyone using a covered 'auto' you own, hire or borrow *except the owner, or any 'employee,' agent or driver of the owner,* or anyone else from whom you hire or borrow a covered 'auto'"); *see also Pa. Nat'l Mut. Cas. Ins. Co. v. Traveler's Ins. Co.*, 592 A.2d 51, 54 (Pa. Super. Ct. 1991) ("This insurance does not apply to the owner of a non-owned automobile *or any agent or employee of such owner . . . .*" (Emphasis added.)). This demonstrates that when the insurer wants to make clear there is no insurance coverage for employees or agents of vehicle lessors, it can readily do so.[12]

---

[12]We acknowledge that ambiguity is not present in an insurance policy "merely because the provision 'could have been worded more clearly or precisely than it in fact was.'" *Am. Family Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 114–15 (Iowa 2005)

Applying our usual rules of interpretation for insurance policies, we find that DiRisio was an insured under the Nationwide policy. This means that Hanson and Hanson Trucking are also insured to the extent of any liability for DiRisio's conduct.

**VII. Conclusion.**

For the reasons stated, we conclude that Iowa Code section 325B.1 does not apply to this case; that the Lease indemnification clause is valid, enforceable, and unaffected by the separate "exclusive control" provision in the Lease; and, that DiRisio is an insured under the Business Auto Coverage Form of Nationwide's policy. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All justices concur except Waterman, J., who takes no part.

---

(quoting *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987)). But here United Suppliers cannot plausibly argue that the language "from whom you hire or borrow a covered 'auto' " unambiguously extends to DiRisio, from whom United Suppliers neither hired nor borrowed the semi-tractor. Even in *Park Pride* it took testimony from the broker in order for the court to conclude the policy did not provide coverage for the driver. *See* 541 S.E.2d at 691.